Mark REITER, Petitioner,

v.

UNITED STATES of America, Respondent.

Nos. 97 Civ. 02941(RO), 87 CR. 132(RO).

United States District Court, S.D. New York.

May 5, 2005.

---

Linda S. Sheffield, Decatur, GA, for Petitioner.

James B. Comey, United States Attorney, for Respondent, Deborah E. Landis, Jonathan New, New York City, on the brief.

*OPINION AND ORDER*

OWEN, District Judge.

Petitioner Mark Reiter has moved for collateral review of his conviction pursuant to 28 U.S.C. § 2255. In 1988 he was tried, together with four co-defendants, on a 13-count redacted indictment which was renumbered 12S 87 Cr. 132(RO), Exhibit A to Respondent's papers. It charged a variety of narcotics-related offenses, as well as a tax violation. Specifically, Reiter was charged in Count One with racketeering (with predicate acts including murder, conspiracy to commit murder, conspiracy to distribute narcotics, heroin distribution, and using a telephone to facilitate a narcotics violation), in Count Two with racketeering conspiracy, in Count Three with operating a continuing criminal enterprise ("CCE"), in Counts Five and Six with heroin distribution, in Count Seven with using a telephone to facilitate heroin distribution, and in Count Thirteen with conspiring to defraud the Internal Revenue Service.

Reiter's trial commenced on May 2, 1988. The evidence against him included the testimony of numerous cooperating witnesses, including Leroy "Nicky" Barnes, James Jackson (who testified, among other things, that Reiter had supplied him with many kilograms of pure heroin, and that Reiter had personally ordered the murders of Beverly and Steven Ash after learning that Nicky Barnes had begun to cooperate with authorities (Tr. 316–343)),[1] Salvatore Corallo (who testified, among other things, that his responsibilities were "to test, package heroin, weigh heroin, deliver [kilogram quantities

---

1. Attached hereto as Appendix A is a copy of excerpts from the Statement of Facts submitted by the Government in its brief on the direct appeal filed by Reiter and his co-defendants. The Statement of Facts contains detailed citations to the trial record. Also included as part of Appendix A are sections of the argument portion of the Government's brief which relate to issues raised in these proceedings, including the Government's refusal to immunize certain witnesses, and the proof that certain individuals were supervisees of Reiter's.

of] heroin and collect cash from the sales of those heroin deals" to Reiter (Tr. 2235–36)), Vito Loiacono (who testified, among other things, that he worked "distributing the heroin for Mark, pick[ing] up money, set[ting] up appointments, pick[ing] up the drugs and stor[ing] it" over a period of years (Tr. 4028–4048)), and Russell Fleming (to whom Vito Loiacono delivered heroin for Reiter, and who Reiter ordered killed after he learned that Fleming was cooperating (Tr. 3709–12, 4172)). The testimony of these individuals was corroborated by diverse and overwhelming evidence from other sources, including heroin supplied by Reiter, which was seized from Russell Fleming upon his arrest; surveillance reports; telephone calls recorded by means of a wiretap on Reiter's phone; a telephone call recorded by Salvatore Corallo in which Reiter offered Corallo $30,000 to plead guilty in a pending heroin conspiracy prosecution; another telephone call recorded by Corallo in which Corallo and William Battista discussed the difficulties in working for Reiter; evidence of Reiter's flight from New York upon learning that Jackson had begun to cooperate; documents and witnesses attesting to Reiter's extravagant lifestyle and his purchase of luxury items with cash; and evidence that Reiter had a no-show job that he used as a cover for narcotics trafficking.

On August 25, 1988, the jury convicted Reiter and his co-defendants on all counts, and found that each RICO predicate had been proven beyond a reasonable doubt. Reiter was sentenced to two life terms of imprisonment, plus 60 years, followed by a lifetime term of special parole, and fines totaling $4 million.

On direct appeal, Reiter complained that: 1) he had been denied a severance;

2) the Court excluded certain tape-recordings he wished to offer; 3) the Court excluded his proposed expert testimony; 4) the Court refused to require the Government to provide extra copies of tape-recordings; 5) the Government had improperly refused to provide immunity to proposed defense witnesses; 6) the Court had refused to provide the jury with special interrogatories on the CCE count, which would have required the jury to identify the five or more individuals Reiter supervised; and 7) the Court had failed in its jury instructions appropriately to distinguish between liability for conspiracy and liability for aiding and abetting. His claims were summarily rejected by the Court of Appeals, which found them "all to be without merit." *United States v. Reiter*, 897 F.2d 639, 646 (2d Cir.1990).

On April 2, 1997, more than seven years after his appeal was denied, Reiter filed a pro se habeas corpus petition. The form submitted by Reiter contained instructions requiring that he "include all grounds for relief and all facts supporting such grounds for relief in the motion you file seeking relief from any judgment of conviction." Petition at 2, number (6).

In his petition, Reiter asserted that his due process rights had been denied by the Government's failure to provide him with exculpatory evidence tending to show that James Jackson had killed Beverly and Steven Ash.[2] Specifically, Reiter claimed that on a day when he was not present in court, it became apparent that there existed "other theories" of why Beverly and Steven Ash were killed, as well as exculpatory witness statements, and that he did not become aware of these matters until two

---

**2.** The trial evidence was that Reiter ordered and Raymond Clark killed the Ashes, and reported to Jackson accordingly. *See Clark v.*

U.S., —— F.Supp. 2nd —— (2005), recently decided.

years later, when he saw the trial transcript. Reiter claimed that his trial attorney was ineffective for having failed to investigate "exculpatory evidence known to other counsel at trial" (Petition at 7), and that his appellate counsel was ineffective "for failure to detect the disclosure issues." (*Id.*).[3]

The Government moved to dismiss the said petition as time-barred under the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA'"), arguing that there was no justification for Reiter's seven-year delay in filing. The Court dismissed the petition as untimely. Reiter thereafter appealed and on September 22, 1998, the Court of Appeals remanded the matter pursuant to its decision in *Mickens v. United States*, 148 F.3d 145 (2d Cir. 1998).

Reiter thereafter obtained counsel, and counsel requested permission to supplement the record. Reiter then made several further submissions to the Court.[4] In certain very limited respects, the additional submissions amplified the claims contained in Reiter's original petition. Specifically, in a supplemental submission filed by counsel on December 29, 1998, Reiter contended that William "Billy" Battista—who had been described by various witnesses during the trial as a supervisee of Reiter's during the period charged in the Indictment—had been an FBI informant during the time period the Beverly and Steven Ash murders had allegedly been ordered by Reiter, and contended that FBI reports withheld by the Government

would have revealed that: 1) Reiter was not in the New York area in 1982, when the hotel meeting described by Jackson at which Reiter allegedly ordered the murders of Beverly and Steven Ash occurred; 2) Battista knew that Reiter did not attend any hotel meeting in 1982; 3) witness statements supporting an alternative theory of the motive for the murders were not produced to the defense; and 4) reports of these statements would have shown that it was believed that Beverly Ash would be a witness for the Government against Reiter. (12/29/98 Supplement at 4–5). According to Reiter, this evidence would substantially have undermined the credibility of James Jackson, the sole witness to his alleged involvement in the Ash murders.

As to many other claims, however, Reiter's supplemental claims were new as defined and hereafter detailed. Among other things, for example, Reiter asserted for the first time that the jury's failure to specify the three or more narcotics violations underlying the CCE conviction violated the Supreme Court's ruling in *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (5/16/02 Amendment, Issue 11); that the failure of the jury to make findings concerning drug amounts violated the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (5/16/02 Amendment, Issue 18); that there was insufficient evidence that Reiter supervised five or more individuals (5/16/02 Amendment, Issue 8); that the Government violated its obligations under *Brady*

---

**3.** Reiter attached an affidavit to his petition, but failed to provide any additional factual specifics concerning his claims.

**4.** Reiter's counsel filed a supplemental submission on December 29, 1998, raising additional claims and amplifying some of Reiter's original claims ("12/29/98 Supplement"). On May 16, 2002, Reiter filed a substantial

"Amendment to Petition for Writ of Habeas Corpus" containing 19 issues and various sub-issues ("5/16/02 Amendment"). That amendment incorporated most of the claims that had been raised for the first time in the supplemental papers filed by counsel in December 1998. A second amended petition was filed on December 18, 2002.

*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to divulge a "deal" made with James Jackson and information collected during interviews with Mike Levy, the owner of Gianpietro's (5/16/02 Amendment, Issues 5 and 6); that the Court committed various errors in instructing the jury (5/16/02 Amendment, Issues 7(A), 7(B), 10, 12, 13, 14, 15, 16(A), 16(b) and 17)); and that the Government intentionally elicited false testimony that William "Billy" Battista was dead and implied that Reiter had killed him (5/16/02 Amendment, Issues 2 and 3).

In other respects, the claims raised by Reiter in his supplemental submissions— including claims based on the Government denial of immunity to proposed defense witnesses—had previously been raised and rejected on direct appeal.

As discussed hereafter, with the exception of Reiter's claim under *Richardson,* those claims that do not relate back to the claim Reiter asserted in his original petition are untimely and are dismissed. Reiter's original claims are discussed hereafter on the merits. His *Richardson* claim is rejected under a harmless error analysis.

A. *Claims That Do Not Relate To The Initial Allegations That The Government Withheld Exculpatory Evidence Relating To The Murders Of Beverly and Steven Ash, And That His Trial Counsel Was Ineffective For Having Failed To Investigate, Are Time–Barred*

■ At the outset of the detailed consideration, it might be kept in mind that the petition originally filed by Reiter in 1997 asserted three related claims: 1) that the Government violated due process by suppressing exculpatory information concerning the murders of Beverly and Steven Ash; 2) that trial counsel was ineffective for having failed to investigate this infor-

mation and an alternative murder theory revealed to his co-defendant's counsel on a day that he and his attorney were not in court; and 3) that appellate counsel was ineffective for having failed to pursue this issue on appeal.

In December 1998 and May 2002, however, Reiter asserted for the first time a variety of claims that bear no relation to the said three claims asserted in his original petition. These claims are all time barred under relevant legal standards. In addition, some of the new claims are not cognizable on collateral review, and others plainly fail on the merits.

1. Applicable Legal Standards For Amendments to 2255 Petitions

■ Reiter invokes Federal Rule of Civil Procedure 15(a) as the basis for this Court's jurisdiction over the claims contained in the Amendments to his petition. Rule 15(a) provides, in relevant part: "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party, and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). But the Government had already responded to Reiter's initial petition, and did not give consent to any amendments. Thus, Reiter's amended petition could have been received "only by leave of court[,]" with leave to amend given freely, absent "bad faith, undue prejudice to the opposing party, or futility of amendment." *United States v. Pittman,* 209 F.3d at 317 (citing, *inter alia, Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Where a cause of action is barred by the statute of limitations, however, amendment would be futile and is denied. *Id.*

#### a. Claims Filed After April 24, 1996 Are Generally Time Barred

Reiter's conviction had become final before the AEDPA added a one-year statute of limitations period to Section 2255. *See* 18 U.S.C. § 2255(1). Therefore, Reiter had one year from the effective date of the AEDPA to file all of his claims under § 2255. *See Mickens v. United States,* 148 F.3d 145 (2d Cir.1998). The AEDPA became effective on April 24, 1996. While Reiter's original petition was filed on April 2, 1997, and thus was timely, he did not file his first motion to supplement the petition until October 28, 1998, and he did not actually supplement the petition before December 29, 1998, when he filed the first of three additional submissions and amendments. Because his amendments were filed after the statute of limitations expired, the amended claims are generally time-barred under subsection (1) of § 2255.

#### b. The Relation Back Doctrine

In order for any of Reiter's amended claims to be considered timely here, each must have related back to the claims in his original petition in accordance with Federal Rule of Civil Procedure 15(c). *See Fama v. Commissioner of Correctional Services,* 235 F.3d 804, 815–16 (2d Cir. 2000). Rule 15(c) provides, in relevant part:

> An amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

In order to "relate back" under Rule 15(c), an untimely § 2255 claim "must have more in common with the timely filed claim than the mere fact that they arose out of the same trial and sentencing proceedings." *Davenport v. United States,* 217 F.3d 1341, 1344 (11th Cir.2000); accord. United States v. Hicks, 283 F.3d 380, 388 (D.C.Cir.2002); *Rodriguez v. United States,* 286 F.3d 972, 981 (7th Cir.2002); *United States v. Pittman,* 209 F.3d 314 (4th Cir.2000); *United States v. Duffus,* 174 F.3d 333 (3d Cir.1999); *United States v. Craycraft,* 167 F.3d 451 (8th Cir.1999). Rather, "in order to relate back, the untimely claim must have arisen from the same set of facts as the timely filed claim, not from separate conduct or a separate occurrence in both time and type." *Davenport,* 217 F.3d at 1344; *accord Hicks,* 283 F.3d at 388 ("both time and type") *Rodriguez,* 286 F.3d at 981 ("same set of facts" and "both time and type"); *Pittman,* 209 F.3d at 318 ("both time and type"); *Duffus,* 174 F.3d at 337 ("same set of facts"); *Craycraft,* 167 F.3d at 457 ("same set of facts" and "both time and type"). This is so that the Government has sufficient notice of the facts and claims giving rise to the proposed amendment. *Hicks,* 283 F.3d at 388 (quoting *Anthony v. Cambra,* 236 F.3d 568, 576 (9th Cir. 2000)).

Thus, "[a]n untimely amendment to a § 2255 motion which, by way of additional facts, clarifies or amplifies a claim or theory in the original motion may, in the district court's discretion, relate back to the date of the original motion *if and only if ... the proposed amendment does not seek to add a new claim or to insert a new theory into the case.*" *Woodward v. Williams,* 263 F.3d 1135, 1142 (10th Cir. 2001) (emphasis in original) (citation omitted); *see also Rodriguez,* 286 F.3d at 981 ("[T]hese circuits have been uniform in their denial of amendments that would add a new claim or theory of relief."). However, it is not sufficient for an untimely amendment merely to assert the same general type of legal claim as in the original § 2255 motion. *See United States v.*

*Craycraft* where the Eight Circuit held that an untimely claim of ineffective assistance of counsel for not filing an appeal did not relate back to timely ineffective assistance claims for not pursuing a downward departure, not raising an objection at trial, and not challenging a prior conviction. *Craycraft*, 167 F.3d at 456–57. The court concluded that counsel's failure to appeal was "a separate occurrence in both time and type" from a failure to pursue a downward departure or to object at trial. *Id.* at 457; *see also Duffus*, 174 F.3d at 336 (claim of ineffective assistance for failure to move to suppress evidence did not relate back to claim of ineffective assistance on appeal).

Moreover, it is appropriate to note that the one-year statute of limitations imposed by the AEDPA applies regardless of any finding of prejudice. *See Duffus*, 174 F.3d at 338 ("[U]sually statutes of limitations operate without taking prejudice from delay into account. A prisoner should not be able to assert a claim otherwise barred by the statute of limitations merely because he asserted a separate claim within the limitations period."). Indeed, courts have dismissed attempts to amend timely Section 2255 petitions with time-barred claims even where the amended petition is filed prior to filing of the government's response to the original petition. *See Pittman*, 209 F.3d at 316; *United States v. Craycraft*, 167 F.3d at 453.

c. *Rule 15(d) Is Inapplicable Here*

■ Reiter makes no attempt to contend that the claims asserted in his amended petition relate back to his initial claims in accordance with Rule 15(c). Instead, Reiter invokes Federal Rule of Civil Procedure 15(d), which concerns the standards for submitting "supplemental pleading[s] setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Rule 15(d), however, is completely inapposite. It has no bearing on the timeliness of Reiter's *amendment* to his § 2255 petition. *See* Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1504 (differentiating between amendments under Rule 15(a) and supplements under Rule 15(d)). Because none of the events which form the basis for the claims contained in Reiter's amended petition occurred after he filed his petition in April 1997 (rather, they all occurred during his trial), Reiter's motion cannot be considered a "supplement" to his initial petition. *See, e.g., Hicks* 283 F.3d at 386. In any event, even a supplemental claim filed under Rule 15(d) would either have to be timely filed or relate back to the claims contained in the initial petition, as discussed above. *See Federal Practice and Procedure,* § 1508.

2. Claims Two Through Ten and Twelve Through Eighteen of Reiter's First Amended Petition, As Well As The Claim In His Second Amended Petition, Are Dismissed

As described above, Reiter raised only three claims in his initial petition, all related to the Government's alleged suppression of exculpatory evidence concerning the Ash murders, and his attorneys' failure to pursue the matter. With the exception of Issue # 1 in the Amended Petition dated May 16, 2002 (which is discussed below), and Reiter's *Richardson* claim (also discussed below) none of the other issues raised in Reiter's supplemental submissions relates back to these original claims. Thus, each is dismissed as time-barred, as well as on the merits.

*Issue # 2: The Government Improperly Argued That Reiter Killed Battista*

*Issue # 3: The Government Created The False Impression That Battista Was Dead*

The second and third issues raised in Reiter's May 2002 Amendment concern

what Reiter alleges as a misimpression created by the Government at trial that Bill Battista—a criminal associate of Reiter's—was dead, and that Reiter had killed him. In particular, Reiter contends that the Government violated his Sixth Amendment rights when it "argued in summation that Reiter killed Battista" and that his attorneys were ineffective for failing to object and raise the issue on appeal. *See* 5/16/02 Amendment at 35–39 (Issue # 2). Reiter also contends that the Government violated due process when it allowed an FBI agent to testify that Battista "may be dead," when in reality the Government knew that Battista was alive.

These claims bear no relation to the claims asserted in Reiter's initial petition. They arise out of a different set of facts and are different in both time and type. Accordingly, they are time-barred and are dismissed.

Even if these claims had been timely filed, however, they fail on the merits. As Reiter admits in his brief, his attorney *did* object at the trial when Vito Loiacano first testified that Reiter said "he heard that [Battista] was found in a van on the Major Deegan." (5/16/02 Amendment at 36 (quoting Tr. 4047–48)). Furthermore, Reiter's attorney made clear during a sidebar conference that he didn't "want [the Government] to argue to the jury that Billy Battista is dead or found in a van," and the Government agreed that it would not make such an argument. *Id.* (quoting Tr. 7520–21). Later, after FBI Special Agent Noone had testified that he did not know whether Battista was dead or alive as of six months before the trial, *Reiter's own counsel* elicited testimony from the

FBI agent that, as of that very day, Battista might be dead and that Battista had not been found anywhere:

Q. [By Reiter's counsel] As of six months ago do you know whether Billy Battista was dead or alive?

A. No, I don't.

Q. Today as you sit here on the witness stand, do you know whether he is alive or he is dead?

A. From personal knowledge, I haven't seen Battista in three years.

Q. From knowledge that you have known and reports and whatever, do you know whether he is dead or alive?

A. By hearsay?

The Court: That's what you are being asked?

A. I believe that the opinion would be that he may be dead.

Q. Has he been found any place?

A. No, sir.

(Tr. 7522). On redirect, Special Agent Noone made clear that Battista had been an FBI informant, and that Battista had become a fugitive in approximately 1985, after it was revealed that he was an informant. (Tr. 7572–73). Thus, although Vito Loiacono did relate a conversation with Reiter in which Reiter claimed that Battista become a cooperator and had thereafter been "found in a van," the evidence in its entirety made clear that this was not, in fact, the case.[5]

Moreover, Reiter mischaracterizes the Government's summation. The prosecutor did not argue to the jury that Reiter

---

5. From the trial transcript it appears that Reiter's attorney, Barry Slotnick, Esq., had more information about Battista's health and whereabouts than did Special Agent Noone. Mr. Slotnick, told the Court that he had been given "the whole file" (presumably referring to Battista's informant file) in connection with the trial of John Gotti in the Eastern District of New York, and that "Battista is alive and well in Mexico someplace." (Tr. 7520–21).

"killed" Battista. (5/16/02 Amendment at 38). Rather, the Government argued to the jury that Reiter got rid of Battista and replaced him with Loiacono after Reiter came to suspect that Battista was an informant. (Tr. 8789) (quoted in 5/16/02 Amendment at 38). This argument accurately reflected the testimony given by Loiacono. Moreover, the fact that Reiter's attorney—who had previously made clear that the Government should not be permitted to argue that Reiter killed Battista (*supra*)—did not object when this statement was made in summation. This reflects not ineffective assistance of counsel, but instead counsel's reasonable belief that the prosecutor's statement in summation did *not* constitute the type of improper argument the Government had agreed at sidebar not to make.

*Issue # 4: Discovery of "New Evidence" Allegedly Impeaching the Testimony of James Jackson*

Reiter contends in Issue # 4 that he has newly discovered evidence that would have contradicted Jackson's testimony that the scar on Romero's hand came from a wound that Romero received during the murder of Barry "Bones" Wilson. (5/16/02 Amendment at 41–45). The purported new evidence consists of (1) a letter from Romero, dated June 28, 2000, in which Romero claims that he received the scar on his hand as a result of a fight with his girlfriend; and (2) an "easy-to-make" affidavit from David Bell dated August 7, 2000—long after the trial—in which Bell claims that he was never in a midtown hotel room with Jackson and Romero in 1982, from which Reiter contends that Jackson's testimony concerning the meeting with Reiter was a fabrication.

As an initial matter, Romero's proposed innocent explanation of the scar on his hand was not newly discovered news to Reiter. Indeed, during trial, Reiter's trial counsel informed the Court—in the context of arguing that the Government should be required to immunize Romero—that counsel had been informed Romero did not receive the cut on his hand as the result of a homicide. (Tr. 6331–32).

■ In any event, it is plain from the dates on Romero's letter and Bell's affidavit that Reiter waited almost two years to assert this claim from the time that he either allegedly learned of it, or could have discovered it through the exercise of reasonable diligence. Accordingly, this issue is also time barred. *See* 18 U.S.C. § 2255(4) (the one year statute of limitations runs from the "date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence").

Nor can the claim be said to relate back to Reiter's original claims. Although Reiter initially raised a claim based on purportedly exculpatory material concerning the murders of Steven and Beverly Ash, he made no reference to the scar on Romero's hand, which was—according to the testimony at trial—the result of a cut received during the murder of Barry "Bones" Wilson. Because this claim arises out of a different set of facts and is of a different type, it is time-barred.

■ Moreover, even if it were not untimely, this claim is procedurally barred. Reiter attempted to call Romero at trial to testify about his scar, but Romero invoked his Fifth Amendment right and refused to testify. (Tr. 6235–36). On appeal Reiter argued unsuccessfully that the Government should have been forced to grant Romero immunity so that he could testify. Reiter cannot now relitigate this issue under the guise of "newly discovered evidence." It is well settled that federal prisoners may not use a Section 2255 motion to relitigate issues raised and addressed on

direct appeal. *See, e.g., Riascos–Prado v. United States,* 66 F.3d 30, 33 (2d Cir.1995). If the same issue was raised and addressed on appeal in a slightly different form, it is considered raised and addressed. *Id.* at 34 (holding that a habeas corpus claim that is merely a "slightly altered rearticulation of a claim that was rejected on ... direct appeal" is still considered "raised and addressed."); *see also Talj v. United States,* 1997 WL 249964, at *6 n. 2 (S.D.N.Y. May 12, 1997).

Furthermore, even if Romero had been immunized, trial counsel could hardly have expected him to be helpful as a defense witness. Romero—who had previously been convicted of heroin distribution offenses—was identified by several witnesses as a key participant in the Jackson organization, and was convincingly portrayed as an extremely vicious individual even apart from the Barry "Bones" Wilson throat-slashing incident. Assuming, *arguendo,* that Romero had been immunized and had agreed to testify, his credibility could hardly have survived much "kicking around", and he could well have further incriminated not only Reiter, but Reiter's co-defendants as well. As argued by the Government on direct appeal, Reiter's strategy was transparent: make the utterly implausible claim that the defense was dependent on the testimony of criminal accomplices and co-racketeers, and then claim a denial of due process based on the Government's refusal to provide blanket use immunity to the putative witnesses.

*Issue # 5: The Government Failed to Disclose All the "Deals" Given to James Jackson*

Reiter contends in Issue # 5 that the Government failed to disclose evidence of an agreement with James Jackson to not prosecute him for the murder of Daisy Whitten. (5/16/02 Amendment at 46–49). In any event, Jackson testified about the many agreements he had with the Manhattan District Attorney's Office, the Bronx District Attorney's Office, and the United States Attorney's Office, and those agreements were entered in evidence. These included his admitting involvement in over ten murders, of which he personally committed four. He also testified that because he had failed to tell the Government about the Daisy Whitten homicide until after the plea agreements were signed, he could be prosecuted for that homicide. (*Id.* at 46–47 (quoting Tr. 611–612, 61516, 699–700)). Ultimately, Jackson was not prosecuted for the murder of Daisy Whitten. On that basis, Reiter speculates that the Government had made another "deal" with Jackson that was never disclosed to the defense and the jury against the above numerous admitted murders. But the absence of a specific agreement as to the Daisy Whitten murder as to which Jackson admitted on this trial could hardly have had further jury impact.

Finally, this claim is time-barred because it bears no relation to the claims asserted in Reiter's initial petition. In his initial § 2255 motion, he made no mention of any undisclosed promises to Jackson.

*Issue # 6: The Government Failed To Disclose Exculpatory Information From Mike Levy, and Presented At Trial A False Theory That Levy Was A Reiter Supervisee*

In Issue # 6, Reiter alleges that the Government falsely argued to the jury that Mike Levy was a supervisee of Reiter's, and improperly failed to disclose the substance of a 1987 interview of Levy by the prosecutors, during which Levy denied any involvement in Reiter's narcotics business. Again, this claim bears no relation to the claims asserted in Reiter's initial petition, because it arises out of a different set of facts and is different in both time and

type. Accordingly, this claim is time-barred and is rejected.

In any event, for several reasons this claim fails on the merits. Jackson, in the earliest days of the trial testified that through Mike Levy, who had a clothing store, (Gianpietro's) was one way to contact Reiter. (Tr. 445–6).[6]

Q. Directing your attention to some-time later in 1984, did there come a time when you attempted to contact the defendant, Mark Reiter?

A. Yes.

Q. How did you attempt to contact him?

A. Well, my sources, the guys that were my connects, were all tied up, one got busted. I went down to Gianpietro and I spoke to Mike Levy. I said, "Listen, I got to get in touch with Mark."

Levy would get in touch with me. He said, "Wait right here." He went outside of the store and came back and said, "He'll be here in a little while." About 15, 20 minutes, Mark arrived.

 First, Reiter mischaracterizes Levy's affidavit when he argues that Maria Galeno, "the lead prosecutor" in Reiter's case, "conducted" an interview of Levy in 1987. (5/16/02 Amendment at 51). The most that Levy himself says about AUSA Galeno is that she was "[o]ne U.S. Attorney who kept coming in and out of the room." (Levy Aff. at T 11, App. 118–120, 5/16/02 Amendment). Second, Levy's post-trial denial of any participation in Reiter's enterprise by no means demonstrates the Levy was not involved. Nor, obviously, does it demonstrate the Government's *knowledge* that he was not involved. Finally, Reiter himself, knowing of Levy from the early trial testimony, would have known full well what Levy would say if, in fact, Reiter had never used Levy or Gianpietro's to facilitate narcotics trafficking, or if, in fact, Reiter had never exercised any supervision over Levy's activities. Nothing prevented Reiter from calling Levy as a defense witness. Therefore, even if Levy's new and self-serving testimony were credited, the Government did not suppress any evidence in violation of its *Brady* obligations. *See United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995) ("evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence" (quotations omitted)); *United States v. Middlemiss,* 217 F.3d 112, 123 (2d Cir.2000) ("Because defendants already were aware of the allegedly exculpatory evidence, they suffered no *Brady* violation"); *United States v. Zagari,* 111 F.3d 307, 320 (2d Cir.1997) ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information").

*Issue # 7(A): The Court Failed to Instruct the Jury That A Government Informant Cannot Be a Supervisee*

*Issue # 7(B): The Court Failed to Instruct the Jury That A Mere Purchaser Cannot Be A Supervisee*

*Issue # 16(A): The Court Failed to Instruct the Jury That A Government Informant Cannot Be a Co–Conspirator Under RICO*

*Issue # 16(B): The Court Failed to Instruct the Jury That A Mere Purchaser Cannot Be A Co–Conspirator Under RICO*

In Issues 7(A) & (B), Reiter alleges that the Court failed properly to instruct the

---

**6.** And *see* pp. 157–8 of the Government's brief to the Circuit (Appendix A attached) detailing Levy's other, somewhat extensive partic- ipation as a supervisee culminating in the summary affirmance.

jury regarding who could properly be considered a supervisee for purposes of the CCE count. Similarly, in Issues 16(A) & (B), Reiter alleges that the Court failed to properly instruct the jury regarding who could properly be considered a co-conspirator for purposes of Racketeering Act 9 in Count 1. Reiter contends that, as a matter of law, neither informants, nor "mere purchasers" of controlled substances can be considered to be supervisees or co-conspirators. He further contends that his trial counsel was ineffective for failing to object to these instruction, and his appellate counsel was ineffective for failing to raise these arguments on appeal.

These claims bear no relation to the claims asserted in Reiter's initial petition. They arise out of a different set of facts and are different in both time and type. None of the claims in Reiter's initial § 2255 motion concerned the Court's instructions to the jury, in general, or the elements of the CCE count or RICO counts, in particular. Accordingly, they are time-barred and are dismissed. (And see further discussion hereon under "Issue 8" immediately hereafter).

*Issue # 8: Insufficient Evidence To Find That Reiter Organized, Supervised, Or Managed Five or More Persons*

In Issue # 8, Reiter contends that there was insufficient evidence for the jury to find him guilty on the CCE count, 21 U.S.C. § 848, because there was insufficient evidence to prove that he had supervised five or more persons. This claim, however, bears no relation to the claims asserted in Reiter's initial petition. It arises out of a different set of facts and is different in both time and type. None of the claims in Reiter's initial § 2255 motion concerned the sufficiency of the evidence, in general, or the CCE count, in particular. Accordingly, this claim is time-barred and is dismissed.

Furthermore, Reiter raised this very same argument on appeal and it was rejected by the Second Circuit. *See United States v. Reiter*, 897 F.2d 639, 646 (1990). In his appellate brief, Reiter argued that the jury might not have found that five or more individuals were supervised by him because the Government had failed to introduce sufficient evidence at trial. In particular, Reiter contended that there was insufficient evidence that his son, Greg Reiter, and Catherine Burke were supervisees. Similarly, Reiter contends in his amended petition that there was insufficient evidence for the jury to find that he supervised Greg Reiter and Catherine Burke, among others. (5/16/02 Amendment at 64–72). Reiter cannot relitigate this issue. *See, e.g., Riascos–Prado v. United States*, 66 F.3d 30, 33 (2d Cir.1995).

■ Finally, this is not the type of claim cognizable under Section 2255. The courts have repeatedly held that "[c]ollateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir.1995) (quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). A challenge to the sufficiency of the evidence falls well beyond these narrow limits.

*Issue # 9: The Telephone Count, 21 U.S.C. § 843, Must Be Overturned*

In Issue # 9, Reiter argues that the Court improperly instructed the jury that a conversation warning another person about a threat to a criminal narcotics conspiracy could be a violation of 21 U.S.C. § 843. This claim, however, bears no relation to the claims asserted in Reiter's ini-

tial petition. It arises out of a different set of facts and is different in both time and type. None of the claims in Reiter's initial § 2255 motion concerned the jury instructions, in general, or the telephone count, in particular. Accordingly, this claim is time-barred and is dismissed.

■ Furthermore, even if this claim were timely, it fails on the merits. Although Reiter's counsel objected to the jury instruction during the trial, *see* 5/16/02 Amendment at 74–75, Reiter failed to raise the issue on appeal. It is well-settled that those convicted of federal crimes may not "save" claims for a habeas petition that they could have raised on direct appeal. *See United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The only exceptions to this rule are claims based on the allegedly ineffective assistance of counsel, *Billy–Eko v. United States,* 8 F.3d 111, 114 (2d Cir.1993), and cases where "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Reiter has not claimed the benefit of either exception for Issue # 9. Therefore, the claim is dismissed.

*Issue # 10: The Court Constructively Amended Count Five of the Indictment*

In Issue # 10, Reiter contends that the Court constructively amended Count 5 of the Indictment by failing to instruct the jury that it must find that Reiter distributed at least 100 grams of heroin. As with the other issues discussed above, this claim bears no relation to the claims asserted in Reiter's initial petition. It arises out of a different set of facts and is different in both time and type. None of the claims in Reiter's initial § 2255 motion concerned the adequacy of the Courts' instructions to the jury or Count 5 of the Indictment.

Accordingly, this claim is time-barred and is dismissed.

*Issue # 12: The Court Constructively Amended the Indictment as to Supervisees*

In Issue # 12, Reiter contends that the Court constructively amended the Indictment when it instructed the jury that the supervisees in the CCE count, and the coconspirators in Racketeering Act 8, need not be co-defendants nor persons specifically identified in the Indictment. This claim, however, bears no relation to the claims asserted in Reiter's initial petition. It arises out of a different set of facts and is different in both time and type. None of the claims in Reiter's initial § 2255 motion concerned the adequacy of the Courts' instructions to the jury, in general, or the charges for Count 3 of the Indictment or Racketeering Count 8, in particular.

In any event, Reiter is procedurally barred from raising this issue. Although Reiter's counsel objected at trial to the jury charge, Reiter failed to raise this issue on appeal. Therefore, he cannot raise it now in his § 2255 motion. *See Frady,* 456 U.S. at 167–68, 102 S.Ct. 1584.

■ Moreover, this claim fails on the merits. The Court's instruction was entirely proper. As Reiter admits, the Government sent him two letters listing alleged supervisees and unindicted coconspirators. At trial, the only individuals that the Government argued were supervisees and/or co-conspirators were among the names it had previously disclosed in its letters. Not all of these individuals, however, had been indicted as coconspirators or otherwise named in the Indictment. Therefore, the Court correctly instructed the jury that the five supervisees necessary for a violation of Count 3 "may be persons identified in the indictment or they may be others." (Tr. 9681). *Compare* Sand, *Modern Fed-*

*eral Jury Instructions,* Instr. 56–29 ("These persons do not have to be named in the indictment. They could be others....").

Issue # 13: *The Jury Instructions Constructively Amended the "Violations" Identified in the CCE Count*

In another attack on the CCE instructions to the jury, Reiter claims in Issue # 13 that the Court constructively amended the Indictment by directing the jury to consider "violations" that were not specifically identified in the Indictment as part of the "continuing series of violations." (5/16/02 Amendment at 93–99). As discussed above, none of the claims in Reiter's initial § 2255 motion concerned the adequacy of the Courts' instructions to the jury, in general, or the CCE charges, in particular. Therefore, Issue # 13 does not relate back to the original petition and are dismissed as untimely.

In any event, this claim fails on the merits. It was not improper for the Court to charge that the jury could consider violations that were not "separately charged" in the Indictment. (5/16/02 Amendment at 95 (quoting Tr. 9681)). Even post-*Richardson*—in which the Supreme Court ruled that the narcotics violations forming the "continuing series" must be found by the jury beyond a reasonable doubt—the model jury charge contained in *Modern Federal Jury Instructions* for the second element of a CCE count instructs: "These violations do not have to be convictions or separate counts in the indictment." Sand, *Modern Federal Jury Instructions,* Instr. 56–28.

Moreover, Reiter cannot raise this claim now, because he failed to raise it on direct appeal. *See Frady,* 456 U.S. at 167–68, 102 S.Ct. 1584.

Issue # 14: *The Evidence Presented at Trial and The Jury Instructions Constructively Amended the Time Period Alleged in the Indictment for Count 3*

Reiter's Issue # 14 raises yet another claim that the CCE count in the Indictment was constructively amended at trial. For the reasons set forth in Issue Nos. 12 and 13, this claim does not relate back to Reiter's initial petition and is dismissed as untimely. Furthermore, this claim is procedurally barred because Reiter failed to raise it on appeal. *See Frady,* 456 U.S. at 167–68, 102 S.Ct. 1584.

Issue # 15: *The Evidence Presented at Trial and The Jury Instructions Constructively Amended Count 7 of the Indictment*

In Count 7 of the Indictment (and Racketeering Act 12), Reiter was charged with using a telephone in the commission of a narcotics offense. Reiter alleges in Issue # 15 that this count was constructively amended by an instruction that allowed the jury to consider any phone call placed into evidence by the Government, rather than the specific phone call identified in the Indictment. (5/16/02 Supplement at 104–106).

This claim bears no relation to any of the claims asserted in Reiter's initial petition. It arises out of a different set of facts and is different in both time and type. None of the claims in Reiter's initial § 2255 motion concerned the adequacy of the Courts' instructions to the jury, in general, or the charges for Count 7, in particular. *See also, supra* Issue # 9.

Furthermore, this claim fails on the merits. Reiter complains about the following instruction given by the Court:

Although not specifically charged as separate crimes in the indictment, the government contends that defendant Mark Reiter committed numerous other viola-

tions of Title 21, United States Code, Section 843 involving the unlawful use of a telephone conversation in which Mark Reiter participated and the government contends this was such an unlawful use of the telephone under the statute to facilitate narcotics transactions and can be considered by you *on this count.* (Tr. 9679, emphasis added). Contrary to Reiter's suggestion, this charge was given *not* in connection with the telephone count or the corresponding racketeering act— both of which were specifically related to the September 2, 1987 call in which Ruggiero warned Reiter that Jackson had left the MCC, but instead in connection with the CCE charge. Thus, there was no constructive amendment of Count 7 or Racketeering Act 12.

*Issue # 17: The Court Improperly Instructed the Jury That it Need Only Find One "Violation" To Find Reiter Guilty On The CCE Count*

In Issue # 17, Reiter contends that the Court erroneously instructed the jury that it need only find that Reiter committed one narcotics offense, rather than a "continuing series of violations" in order to convict him on the CCE count. (5/16/02 Amendment at 111–114). For the reasons set forth in Issue Nos. 12, 13, and 14, this claim does not relate back to Reiter's initial petition and is dismissed as untimely.

Even if this claim were not time-barred, it fails on the merits. Reiter misleadingly quotes from other portions of the Court's instructions on the CCE count and misquotes the instruction given for the second element of the offense. (5/16/02 Amendment at 112–13). The Court's actual instruction to the jury on the CCE count was as follows:

> The second element you must find ... is that he committed one or more of these offenses as part of a continuing series of

violations by him of federal narcotics laws. In this case the word series means three or more such violations. (Tr. 9680). This instruction was proper and made it clear that the jury needed to find that Reiter had committed at least three narcotics violations.

*Issue # 18: Apprendi Should Apply Retroactively*

■ Reiter's sentence on Count 5 of the Indictment was based upon drug amounts determined by the Court, rather than by the jury. For this reason, Reiter argues in Issue # 18 that he was sentenced in violation of the Supreme Court's ruling in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and that *Apprendi* should be applied retroactively to reduce his sentence. This claim fails because the Second Circuit Court of Appeals has joined many other circuits in holding that *Apprendi* does not apply retroactively. *Coleman v. United States,* 329 F.3d 77 (2d Cir.2003).

*The Second Amendment to the Petition: Insufficiency of The Evidence On Count Five*

On December 18, 2002, Reiter filed a second amendment to his petition, in which he argued that the evidence was insufficient for the Court to sentence him on Count Five based on 100 grams of heroin. This claim bears no relation to any of the claims asserted in Reiter's initial petition. It arises out of a different set of facts and is different in both time and type. Accordingly, it is time-barred.

In addition, this is not the type of claim cognizable under Section 2255, because it does not allege "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of jus-

tice.' " *United States v. Bokun,* 73 F.3d 8, 12 (2d Cir.1995) (citation omitted). The Second Amendment to the Petition is therefore dismissed.

### B. Reiter's Original Claims Should Be Dismissed

Turning to the claims asserted by Reiter in his original petition, as amplified by his later submissions, the essence appears to be that William "Billy" Battista was an FBI informant during the 1982–83 period, that Battista was being debriefed by an FBI agent concerning Reiter during that period, that Battista never mentioned having accompanied Reiter to a hotel room in midtown for a discussion with Romero and James Jackson about killing Beverly and Steven Ash, that Battista *would have* mentioned such a meeting had it occurred, that the absence of any such mention in the debriefing reports was exculpatory because it undermined Jackson's testimony, that Battista further informed the FBI that Reiter was not in New York prior to 1982 and therefore could not have attended the hotel room meeting described by Jackson, that the Government suppressed those reports in violation of its *Brady* obligations, and that the Government "hid" Battista from the defense because his testimony would have impeached Jackson. Reiter further claimed that these matters and other exculpatory matters—including an alternative theory to Jackson's as to why the Ashes were murdered, *i.e.*, that Beverly Ash was viewed as a possible witness against Reiter—were discussed during a court proceeding at which Reiter was not present, and that Reiter did not learn about them for two years. (Discussed already supra p. 423). Reiter contends that his trial counsel failed to learn about and investigate the alternative theory, and that his appellate counsel failed to assert a claim that the Government had violated its *Brady* obligations. Reiter asserts that he

has repeatedly sought under FOIA and the Privacy Act the reports that would support these claims, but that the records have not been provided.

Reiter's claims are meritless for a wide variety of reasons. First, if in fact there was no hotel room meeting in 1982 at which Reiter directed the murders of Beverly and Steven Ash, then Reiter did not need FBI 302's or other reports of debriefings of Battista to know that if he called Battista as a defense witness, Batista would deny that such a meeting had occurred since Reiter—according to him—knew perfectly well what Battista would say about whether any such meeting had occurred, the Government cannot be accused of having suppressed that information under *Brady.* Similarly, if Reiter was not in New York during late 1982 and Battista had knowledge of his whereabouts, he did not need to be informed of those facts through FBI debriefing reports of Battista. *See United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995) ("evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence" (quotations omitted)); *United States v. Middlemiss,* 217 F.3d 112, 123 (2d Cir.2000) ("Because defendants already were aware of the allegedly exculpatory evidence, they suffered no *Brady* violation"); *United States v. Zagari,* 111 F.3d 307, 320 (2d Cir.1997) ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information").

 Second, as Reiter concedes, the essential facts he says were "suppressed" by the Government were in fact all revealed at a hearing during the trial held by the Court at the request of counsel for codefendant Raymond Clark on August 1,

1988. Specifically, on that day, Special Agent Patrick Colgan testified that he was Battista's FBI supervisor, and that Battista never disclosed to him any information about Reiter's participation in a homicide. (Tr. 7977–78). Thus, these facts were part of the public record, and therefore could not have been "suppressed" within the meaning of *Brady*. A copy of the transcript of that hearing is attached hereto as Exhibit D to the Government's papers on this motion. Even if it is true that Reiter did not familiarize himself with this portion of the transcript until two years later, his inattention to the matter does not make out a *Brady* violation against the Government.

Third, the record makes plain that the Government did not "hide" Battista from the defense, but that Battista had become a fugitive after it was revealed that he was an informant for the FBI. (Tr. 7572–73). Reiter and his counsel knew this because they were present in court when this testimony was elicited from FBI Special Agent Noone. Furthermore, Mr. Slotnick informed the Court that the FBI had revealed Battista's informant status during a trial in the Eastern District of New York, that he "had the whole file," and that Battista was—at the time of the trial— living "in Mexico someplace." (Tr. 7520–21).

Fourth, copies of FBI debriefing reports that are currently in the possession of the United States Attorney's Office were provided separately for the *in camera* review which I made and have sealed for appellate review.[7] These reports do not support Reiter's claim that had Battista been available, he would have testified that Reiter was not in New York in late 1982 when the hotel meeting took place.

Fifth, as the FBI agents and defense counsel made clear to the Court at trial, Battista was not available to testify for either party at trial. Had Reiter's attorney sought to impeach Jackson by calling Special Agent Colgan to testify about Battista's debriefings, counsel presumably would have opened the door to all of the information provided by Battista that corroborated Jackson's testimony about Reiter's large-scale involvement in heroin trafficking. Moreover, even had Agent Colgan testified that Battista never mentioned Reiter's participation in the homicides, Battista's failure to mention that meeting by no means established that the meeting never took place; indeed, given that Battista would have implicated himself in a murder conspiracy had he disclosed such a meeting to the FBI, his reticence would have been understandable. Under the circumstances, it could hardly be considered "ineffective assistance" for defense counsel to have declined to pursue such a strategy.

Finally, the only "alternative theory" of a motive for the Ash murders mentioned by Reiter in his submissions is a theory that Beverly Ash was a possible witness against Reiter. (See 12/29/98 Supplement at 5). As an initial matter, this "alternative theory" could hardly be considered "exculpatory" of Reiter. To the contrary, this theory gives Reiter an even more direct motive to kill the Ashes than a theory that indirectly implicates the Ashes through the cooperation of Leroy "Nicky" Barnes. In any event, this "alternative" theory is not alternative at all; it is entirely consistent with Jackson's testimony that, at the hotel meeting, Reiter explained that Beverly and Steven Ash "could hurt

---

7. The packet of these reports are being forwarded to the Court of Appeals along with this opinion.

us and hurt a lot of people," (Tr. 317–8) which a listener could have interpreted to be a reference to their possible cooperation. (Tr. 309).[8]

Accordingly, I cannot conclude that the Government suppressed exculpatory evidence concerning the Ash murders. Conversely I cannot find that trial counsel was ineffective for having failed to pursue additional evidence concerning William Battista. Nor, obviously, was appellate counsel ineffective for failing to assert a *Brady* violation on appeal. This claim is dismissed.

## C. Reiter's Claim Under *Richardson* Should Be Dismissed

In *Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), the Supreme Court ruled that in order for a defendant to be convicted under the CCE statute, 21 U.S.C. § 848, the jury must unanimously agree not only that defendant committed a continuing series of violations, but also about which specific "violations" make up that "continuing series." Because Reiter was tried before the rule in *Richardson* was announced, the jury in this case was not so instructed by the Court. The Court of Appeals has ruled that *Richardson* is to be applied retroactively on collateral review. *Santana–Madera v. United States,* 260 F.3d 133 (2d Cir.2001). However, the Court of Appeals has also made plain that a harmless error analysis applies. *Id.*

In *Santana–Madera,* the Second Circuit found harmless error where the trial court, prior to *Richardson,* had failed to instruct that the jury was required to agree unanimously as to which violations made up the "series" necessary for conviction under the CCE statute. However, the jury had simultaneously convicted the defendant of eight substantive narcotics offenses as well as a conspiracy to distribute narcotics. The Court held:

> So, if the district court were clairvoyant and had given the jury the instruction required by Richardson, it is beyond cavil that the jurors would have unanimously agreed on three predicate violations of the drug laws. They unanimously agreed on nine such violations. The error here . . . is clearly harmless.

260 F.3d at 141.

Precisely the same logic applies here. Reiter was convicted of two substantive heroin distribution violations (Counts Five and Six), as well as one count of using a telephone to facilitate narcotics trafficking. (Count Seven). Thus, had this Court instructed the jury, pursuant to *Richardson,* that it had to agree unanimously and beyond a reasonable doubt that Reiter had committed at least three narcotics violations, it clearly would have done so. Thus, the error was plainly harmless.[9] Reiter's *Richardson* claim is therefore dismissed.

---

**8.** Reiter also argues in his Amended Petition that Jackson had his own motive to kill Beverly and Steven Ash. But indeed the "alternative theory" that it was Jackson, in fact, who had ordered or committed the various homicides he was attributing to others was vigorously advanced by defense counsel at trial.

**9.** Even aside from the three substantive violations charged in Counts Five, Six and Seven, there can be no doubt that the jury, had they been properly instructed under *Richardson,*

would have found many more violations. Indeed, the fact that Reiter was convicted on the RICO charges and the tax charge, and that the jury necessarily concluded with respect to the CCE charge that Reiter had derived "substantial income" from his continuing criminal enterprise activities, reflect clearly that the jury believed Reiter to be a large-scale heroin dealer whose activities spanned many years.

## Conclusion

Accordingly, for the forgoing reasons, Reiter's § 2255 petition is dismissed in its entirety.

So ordered.

### EXHIBIT A

No. 88–1493

To be argued by ROBERT HAMMEL

United States Court of Appeals FOR THE SECOND CIRUIT

Docket Nos. 88–1493, 88–1494, 88–1500, 88–1501, 89–1226

UNITED STATES OF AMERICA, Appellee,

v.

MARK REITER, RAYMOND CLARK, a/k/a "Romar," LEONARD ROL-LACK, a/k/a "Petey," a/k/a/ "Peter Rollack," a/k/a "Peter Ifill," ALFRED DICKS, and TIMOTHY SMITH, a/k/a "Heartbeat," Defendants,

MARK REITER, RAYMOND CLARK, LEONARD ROLLACK, ALFRED DECKS and TIMOTHY SMITH, Defendants–Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES OF AMERICA

Benito Romano, United States Attorney for the Southern District of New York, Attorney for the United States of America.

Robert Hammel, Maria T. Galeno, Robert W. Ray, Andrew E. Tomback, Kerri Martin Bartlett, Assistant United States Attorneys, Of Counsel.

Reiter, Clark, Rollack, Dicks and Smith are serving their sentences.

### Statement of Facts

#### A. The Government's Case

#### 1. Summary

The proof at trial abundantly established that each of the five defendants participated in a racketeering enterprise headed by cooperating witness James Jackson, an enterprise that distributed vast quantities of heroin supplied by the continuing criminal enterprise supervised by defendant Mark Reiter. The Government proved that members of the racketeering enterprise distributed millions of dollars' worth of narcotics over a seven-year period in New York, Connecticut, Washington, D.C., and other locations on the East Coast, and committed more than a dozen murders to protect and promote their enterprise. In particular, the Government proved that one or more of the defendants on trial were responsible for at least seven murders and two attempted murders, including one murder in which the victim's throat was slit with a straight-edged razor, after the victim had been tortured in an effort to obtain information from him.

Each defendant played an important role in the activities of the racketeering enterprise. Defendant Mark Reiter provided the Jackson organization with its supply of pure heroin and ordered the organization to commit the murders of Beverly Ash and Steven Ash. Although Jackson purchased approximately 45 kilograms of pure heroin worth more than 10 million dollars from Reiter, the evidence also showed that Reiter was a major supplier of heroin to others, including Peter Monsanto, Mitchell Jackson, Warren Tyson, Alan Morris, and Joseph Hayden, a/k/a "Jazz." Defendant Raymond Clark acted as the "enforcer" for the Jackson organization and shot to death at least three of the enterprise's victims. Defendant Timothy Smith distributed sizeable

quantities of the organization's heroin and participated in the murders or attempted murders of six men. Defendant Leonard Rollack also distributed the enterprise's drugs and directed the murder of a rival drug dealer. Finally, defendant Alfred Dicks was one of the two largest wholesale customers of the Jackson organization's heroin and provided storage facilities for the enterprise's arsenal of weapons used in a premeditated shootout in Bridgeport, Connecticut.

The Government's proof at trial consisted of 60 witnesses and more than 450 exhibits. Those witnesses included Jackson himself,* other former members of the Jackson racketeering enterprise, Leroy "Nicky" Barnes,* and workers whom Mark Reiter had supervised in his continuing criminal enterprise, including two of his closest assistants, Vito Loiacono and Salvatore Corallo. The Government also presented the testimony of surveillance agents and agents who had participated in various arrests and searches, and a vast array of physical evidence, including narcotics and narcotics paraphernalia, drug records, address books, and tape-recorded telephone conversations obtained through a court-ordered wiretap on Reiter's telephone. That evidence overwhelmingly established the existence of both the charged racketeering enterprise and the continuing criminal enterprise, and it established each defendant's participation in the criminal affairs of one or both of those enterprises.

## 2. The Origins of The Racketeering Enterprise

### a. The Formation of the Enterprise

The roots of James Jackson's narcotics enterprise, which at its height distributed as much as a quarter of a million dollars' worth of heroin per week (Tr. 396),* go

---

\* On September 15, 1987, Jackson entered into cooperation agreements with the United States Attorney's Office for the Southern District of New York, the New York County District Attorney's Office, and the Bronx County District Attorney's Office. On September 15, 1987, pursuant to those agreements, Jackson pled guilty before Judge Owen to one count of participation in a racketeering enterprise, one count of possession of heroin with the intent to distribute it, and two counts of tax evasion. Those counts together carried a maximum term of imprisonment of forty-five years. Jackson also agreed not to contest forfeiture proceedings in connection with the Government's seizure of a 1986 Mercedes Benz; a mink coat; and certain jewelry valued in excess of $80,000. In accordance with his agreements with the Government, Jackson will not be further prosecuted for narcotics or tax violations which he committed prior to the execution of the agreements. On February 8, 1989, Judge Owen sentenced Jackson to a term of imprisonment of 25 years, to be followed by a special parole term of 25 years. Jackson is currently serving his sentence.

\* Barnes was convicted after trial in 1978 of operating a continuing criminal narcotics enterprise, in violation of Title 21, United States Code, Section 848. The late Honorable Henry F. Werker sentenced Barnes to life imprisonment without parole. In July 1981 Barnes contacted the United States Attorney's Office for the Southern District of New York and began cooperating with the Government. Pursuant to a cooperation agreement with the Government, Barnes pleaded guilty in 1983 to participation in a racketeering enterprise involving narcotics trafficking and murder between January 1972 and July 1981. In August 1986 the Honorable Milton Pollack sentenced Barnes to a ten-year term of imprisonment, to run concurrently with his life sentence. As part of its understanding with Barnes, the Government agreed to inform the Department of Justice's Pardon Attorney, who handles clemency applications, of Barnes' cooperation. Barnes is currently serving his sentence and has an application for clemency pending.

\* "Tr." refers to the trial transcript; "GX" refers to the Government's exhibits at trial; "[Name] DX" refers to the named defendant's exhibits at trial; "[Date] Tr." refers to the transcript of a proceeding held on the speci-

back to 1979–1980, when Jackson was serving a sentence for bank robbery at the Federal Correctional Facility in Ashland, Kentucky. Jackson became friends with defendant Leonard "Petey" Rollack, Eugene Romero and Joseph Bethea. (Tr. 158–66, 188–89, 1415–21). While in jail, Rollack gave Jackson instructions about how to conduct a narcotics business and informed Jackson that their fellow inmate Romero was the nephew of former Harlem drug kingpin Nicky Barnes. (Tr. 162–64, 892). In the spring of 1980, when Jackson was released to a half-way house, he re-established contact with Romero, who was selling heroin in partnership with one Steven Ash. (Tr. 165, 198, 217, 302, 309, 8636). At about that time, Romero introduced Jackson to defendants Timothy Smith, a/k/a "Heartbeat," and Raymond Clark, a/k/a "Romar." (Tr. 198–99, 240–44). Romero told Jackson to take instructions and learn the drug trade from Smith (Tr. 198–201), and he also informed Jackson that "Romar" was the "enforcer" for Romero's organization. (Tr. 235, 4636, 6100). While still at the half-way house, Jackson, at Romero's direction, committed his first homicide by shooting Harry Hansen at a bar. (Tr. 203–211, 614–15, 682–86, 713, 824). After the murder, it was Timothy Smith who drove Jackson back to the half-way house. (Tr. 210).

After having learned about the heroin trade from Smith and having been released from the half-way house, Jackson started selling heroin out of a hotel on 116th Street in Manhattan. (Tr. 217). Jackson worked with a partner, Stephen

Cobbs, who was Romero's cousin and whom Romero had introduced to Jackson. (Tr. 211). During that period, Jackson and Cobbs sold approximately 150 to 200 "quarters" of heroin per day, at a retail price of between 30 to 40 dollars per quarter. (Tr. 220). The operation soon expanded to 117th Street in Manhattan, and Jackson gradually recruited additional workers, including Teddy Key, Marco Wyche, Matthew Walton and Rodney Stokes. (Tr. 225). Starting in 1980, the enterprise also distributed heroin in Bridgeport, Connecticut, using co-racketeers Warren Cooper, Tyrone Johnson, Jerome Hart and, sometime later, defendant Alfred Dicks. (Tr. 226–27). Jackson was introduced to Dicks by Tyrone Johnson, and Dicks came to be one of the two larger heroin customers of the enterprise. (Tr. 227–28, 620).

During one of his trips to Connecticut, Jackson was arrested on a charge of attempted murder, but the case was dismissed after Romero and Raymond Clark had induced the intended victims to make false statements exonerating Jackson. (Tr. 229–38). When Jackson had difficulty raising bail money in connection with his Connecticut arrest, in an obvious reference to defendant Mark Reiter, Romero told Jackson that his partner Steven Ash would reach out to his new "white" heroin supplier. (Tr. 309). Ultimately, however, it was co-racketeer Leonard Rollack who provided the $5,000 cash bail that Jackson required. (Tr. 310).

fied date; "[Name] Br." refers to the named defendant's brief on appeal; "App." refers to the joint appendix; and "Smith App." refers to the appendix filed by Smith and erroneously labeled a "Joint Appendix." The Government objected to the appendix because it contained materials not in the record and not submitted to the District Court. Smith subsequently filed a second appendix but failed to paginate it. Notwithstanding the Government's objections to it, for the convenience of the Court, the Government will herein refer to Smith's first so-called "Joint Appendix," which is paginated.

## b. The Killing of Allen Bailey

In 1980 Timothy Smith, already a prominent member of Romero's organization, was selling the heroin that he received from Romero on 112th Street and Eighth Avenue in Manhattan (Tr. 242–43, 403). During a period when Smith's supply of heroin had been interrupted, Smith allowed another drug dealer, Allen Bailey, who relied on a different supplier, James Pridgen, to sell on the same block so that customers would continue to frequent the block. (Tr. 242–43, 251–52). When Smith's supply of heroin resumed, he came to learn that Allen Bailey's heroin was superior in quality and thus ordered Bailey to leave the block (Tr. 244). At around that time, shots had been fired at Smith and his fiancee, and Smith was told by a woman named "China" that Bailey was responsible. (Tr. 244–46).* Smith believed that Bailey had been ordered to kill him by Bailey's supplier, James Pridgen. (Tr. 251–52).

In January of 1981, Romero learned Allen Bailey's address and directed Smith and an accomplice named "Moon" to kill him. (Tr. 247). Some hours later, Moon returned and told Romero and Jackson that Bailey had been killed and that Smith had been accidentally wounded in the cross-fire. Romero told Jackson to go with another accomplice, Mike Sammersville, a/k/a "Bama Mike," to find out the hospital where Smith was being treated. (Tr. 248–49). Travelling in Romero's blue Volvo, Jackson and "Bama Mike" discovered that Smith had been transferred from the hospital where he had originally been taken to Jacobi Hospital in the Bronx. (Tr. 249). After visiting Smith at Jacobi, Jackson and "Bama Mike" were questioned by police at the hospital and arrested. (Tr. 250, 5506–15). The police also discovered a photograph in Romero's car showing Jackson with Smith, a photograph which demonstrated that Jackson had been lying when he told the police that he had not come to the hospital to visit Smith. (Tr. 250, 5510–17). No charges were brought against Jackson at that time, however. (Tr. 250).

Smith subsequently told Jackson about the details of the murder of Allen Bailey, explaining that he and Moon had spotted Bailey at the trunk of his car near Bailey's residence and had approached him, one on either side. (Tr. 250–51). Smith further reported to Jackson that Moon had accidentally shot Smith and that the bullet was still lodged in Smith's body. (Tr. 251).*

## c. The Murder of Ronald Burroughs and One of His Bodyguards

At a meeting of the co-racketeers at which Jackson, Smith, Romero and others were present, Romero informed the group

---

* An address book seized from co-racketeer Leonard Rollack contains a listing for "China." (GX 564).

* Jackson's testimony was corroborated by substantial additional evidence introduced at trial. Photographs of the crime scene showed that Bailey indeed had been shot at the trunk of a car; hospital records showed that Smith had been admitted under a false name to two hospitals for treatment of a bullet wound within hours of the shooting; a stipulation established that Smith had a scar on his stomach consistent with a bullet wound; shell casings and physical evidence at the scene of the homicide showed that at least two weapons had been used in the killing of Bailey; and live ammunition found on Smith at the hospital matched in caliber the bullets used in the killing of Bailey. (GX 505). In addition, Detective Richard Cattrano, who investigated the Bailey homicide on the night it occurred, confirmed Jackson's testimony about his and Sammersville's visit to the hospital and further testified that Smith had claimed to be the victim of an attempted robbery. (Tr. 5503–17).

that a rival drug dealer and sometime extortionist known as "Black Ronnie" had to be killed. (Tr. 256–58, 2964). The plan was to kill "Black Ronnie," whose real name was Ronald Burroughs, that same night at a discotheque known as "Reflections." Burroughs, however, failed to appear at the club that evening. (Tr. 257–58).

The following Sunday, Jackson, Smith and others met again at Reflections. Jackson instructed the group that once Burroughs had arrived, he would fire at Burroughs and that the others should then fire at Burroughs' bodyguards. (Tr. 259–60). While Burroughs was dancing with Beverly Ash, a/k/a "Shamecca," Jackson shot him and also fired at one of his bodyguards. (Tr. 260–62). Immediately after shooting Burroughs, Jackson heard other shots and thus was not sure whose shots actually downed the bodyguard. (Tr. 261). A total of eight people were shot that night at Reflections. Two of them—Ronald Burroughs and his bodyguard Ray Charles Brown—died. (Tr. 1825–44; GX 510A–R). Smith held other occupants of the club at bay with his gun so that Jackson could escape. (Tr. 262). The participants then reunited at the Showplace, where Smith and another co-racketeer named "Billy Logan" each bragged to Romero that "he got his man." (Tr. 263). Although Ronald Burroughs and one of his bodyguards had been killed that night, the group viewed a television report at the Showplace and learned that Billy Logan's target had only been wounded. (Tr. 262–63, 1654–56).

Following the shooting, Guy Fisher, a member of Nicky Barnes' narcotics "council," told Jackson that he had done "good work" at Reflections. (Tr. 265). Notwithstanding Fisher's praise, Jackson and Romero were concerned that Fisher had learned that they were responsible for the shooting, and they believed that Fisher's source of information was Cecil Kellman, who had worked for Fisher prior to working for Jackson. (Tr. 265–66). Romero thus had Kellman killed. (Tr. 266–67, see also Tr. 2965–67).

Kellman had indeed discussed Burroughs' homicide with associates of Nicky Barnes. One day Kellman told Walter Centano, who had been convicted of distributing heroin along with Nicky Barnes and others, to stay away from Reflections discotheque. A few days or a week later, Kellman told Centano that they had killed Burroughs while Burroughs was dancing with "Shamecca." (Tr. 265–66, 2963–64). Kellman also told Centano that a man nicknamed "Heartbeat" had participated in the shooting. (Tr. 2964).

#### d. The Killing of Norman Bannister

Norman Bannister, who was known as "Stormin' Norman," was a drug dealer who sold heroin on 115th Street between 7th and 8th Avenues in Manhattan—a block that Leonard Rollack wished to control. (Tr. 271–72, 402, 8328–31). Relations between Rollack and Romero were close, and at one time, shortly after the three men had been released from the Federal prison in Ashland, Kentucky, Romero had Jackson deliver approximately $35,000 to Rollack. (Tr. 268–70). Sometime after Jackson had visited Rollack's stash pad, Jackson saw Romero and Rollack talking in a barber shop, and after that conversation, Romero exclaimed to Jackson, "I got to do the Boxer [Rollack] a favor. I got to kill somebody and I am not even going to get paid for it." (Tr. 270). Later Jackson learned that it was Bannister whom Romero was going to kill. (Tr. 270–72).

Sometime later, Romero instructed Jackson to go to the Madrid Bar in Manhattan, informing Jackson that Raymond Clark had just shot Bannister and telling

Jackson to make sure that Bannister was really dead. (Tr. 272–74). Jackson saw Bannister's body, with a head wound, being carried out to an ambulance and heard the medics say, "Bag him." (Tr. 274, 1632, 1643). Jackson then went to meet with Romero and other co-racketeers, including Clark and Smith, where he learned that Clark had shot Bannister in the head while Bannister was at a PacMan machine in the bar. (Tr. 274–75, 1631–32). Romero and Clark were furious that a confederate, J.R. Alston, who had been present at the murder scene, had accidentally dropped his gun. (Tr. 274–76, 1632–33, 1642). Jackson subsequently learned additional details about the killing of Norman Bannister in separate conversations with Alston and with Clark, the latter of whom bragged about his accomplishment. (Tr. 276–78).

### e. Ash Is Edged Out Of The Enterprise.

In the spring of 1982, when his partner Steven Ash had fallen behind in his payments to Reiter, for the first time Romero introduced Jackson to Mark Reiter. (Tr. 312–15, 1899–1900, 1906, 3523–25). After talking with Reiter outside of Jackson's hearing, Romero told Jackson, "we are going to be all right." (Tr. 313–15). From that time on, Romero continued to have a supply of pure heroin, and Ash made fewer appearances at the cutting mill. (Tr. 315). Because Romero now had the "connect," he was considered to be "in charge" of the enterprise, and over time Jackson replaced Ash as Romero's partner. (Tr. 315).

Jackson next saw Reiter about six months later, in a meeting attended by Romero and Billy Battista, whom Jackson and Romero referred to as Billy "White Hair." (Tr. 316–17). At that meeting Reiter informed Romero and Jackson that Nicky Barnes was cooperating with the Government and that therefore Steven Ash and his sister Beverly Ash, or "Shamecca," had to be killed. (Tr. 316–19; *see* pp. 16–20 *infra*). Over the next six months or so, Romero and Clark committed the murders of Beverly and Steven Ash, as well as of one of Ash's workers, Barry Wilson, who was tortured and murdered in an attempt to learn Steven Ash's whereabouts. Jackson's racketeering enterprise and Reiter's continuing criminal enterprise had their closest collaboration in accomplishing those murders. As a result of the murders, Reiter eliminated a threat to his enterprise, and Romero and Jackson gained a reliable "connect" that allowed them to exercise unquestioned control over their co-racketeers.

### 3. The Murders Of Beverly And Steven Ash And Barry Wilson

### a. Background

In 1980 Leroy "Nicky" Barnes and Herbert Sperling were both serving life sentences in the federal penitentiary in Marion, Illinois. (Tr. 1881–82). Sperling told Barnes that he knew a supplier of heroin named "Mark," whom he described as a white man somewhat over six feet in height, who was looking for customers. (Tr. 1887–88, 1893–94). Sperling wanted to know if any of Barnes' associates would be in a position to purchase his contact's heroin. (Tr. 1887). Barnes suggested to Sperling that "Mark" supply Steven Ash with heroin, and with the help of intermediaries, arranged a meeting between "Mark" and Steven Ash. (Tr. 1892–95, 1899, 1901–2). Steven Ash was the brother of Beverly Ash, or "Shamecca," with whom Barnes had been romantically involved. (Tr. 1888). Barnes hoped that by making Steven Ash financially independent, Ash's sister Shamecca would not have to rely on Guy Fisher, with whom Barnes thought

she was having an affair. (Tr. 1888–91, 1908, 1910).

By June of 1981, Steven Ash had received at least three kilogram packages of heroin from "Mark," but Ash was having difficulty paying "Mark." (Tr. 1899–1900, 1906). Salvatore Corallo, who assisted Reiter in distributing heroin, saw Reiter driving Ash's luxury car and was told by Reiter that Ash had given Reiter the car because Ash was behind in payments. (Tr. 2282–83). Ash also told Elvornia Myles that he was having financial difficulties (Tr. 3525), and Romero was providing security for Ash at this time. (Tr.1909–10). That security was necessary because, by the end of 1981 and into 1982, financial disputes between Steven Ash and "Mark" had become more severe, and "Mark" had threatened to kill Ash if Ash did not pay him approximately $100,000. (Tr. 311–12, 1914–18, 3523–25). It was around that time that Nicky Barnes began cooperating with law enforcement authorities (Tr.1916, 1918); that Romero first introduced Jackson to Mark Reiter (Tr. 217, 312–13, 1037–39, 3513–14, 3516); and that Romero began replacing Ash as the person who brought the pure heroin to the mill to be cut. (Tr. 315).

### b. Reiter Orders the Murders of Steven and Beverly Ash.

In approximately October of 1982, when Barnes' cooperation had become public, Jackson was directed by Romero to attend another meeting with Reiter. (Tr. 316–17, 1934). At that second meeting, Reiter told Romero:

> I got some bad news for you. Your uncle is cooperating with the government and with his cooperation he could

hurt a lot of people, including myself. Not only that, Shamecca knows me and Steven got drugs from me and they could also hurt me.... You got to get rid of them.

(Tr. 317–18). Romero, who had previously told Jackson that he would never kill a black man on the order of a white man,[*] nonetheless agreed to carry out Reiter's orders to kill his uncle's girlfriend and her brother and explained to Jackson, "Man, I'm going to do what I have got to do." (Tr. 318–19).

On December 13, 1982, Beverly Ash was shot to death by a masked man in a Manhattan bar. (Tr. 91–146). At around that time, Romero had warned Jackson to stay away from the Monarch Bar because there was going to be "trouble up there." A few days after that warning, Clark told Jackson that he was responsible for the murder. (Tr. 319–21). Clark explained that he had walked with a hunched back and had worn a white mask so that he would be mistaken for a white man. (Tr. 321–22). Romero also discussed the killing of Beverly Ash with Jackson and told Jackson that they now had "to get Steven [Ash]." (Tr. 322).

### c. The Search for Steven Ash and the Killing of Barry Wilson

When Steven Ash did not attend the funeral of his sister, the enterprise redoubled its efforts to locate him in order to carry out Reiter's orders. (Tr. 324). Unable to find him, Romero decided that the organization should contact Barry Wilson, who was known as "Bones" and who distributed drugs for Ash. (Tr. 324, 3209, 3525–26). Jackson's partner, Steven Cobbs, provided Romero and Smith with Bones' address. (Tr. 324–25).

---

[*] Mark Reiter, Billy Battista, Vito Loiacono and Salvatore Corallo are white. All other known members of Jackson's racketeering enterprise are black.

Approximately a week later, Romero told Jackson that Bones had just been killed, and he asked Jackson to drive to a bridge at Orchard Beach to make sure that the body that had been thrown off the bridge had gone into the water and was not visible. (Tr. 325–26, 328). A few days later, Jackson met with Romero and noticed that Romero's hand was bandaged. (Tr. 327–28). Romero explained that he and Smith had handcuffed and tortured Wilson in an attempt to learn Steven Ash's whereabouts and then, with Smith holding Wilson, Romero had slit Wilson's throat with a razor but had accidentally cut his own hand in the process. (Tr. 327). Notwithstanding the torture, Barry Wilson had revealed nothing about Steven Ash's location. (Tr. 329). Romero also told Jackson that he and Smith had put Wilson's body into some plastic garbage bags with barbells, tied it up with ropes, put it in Smith's car, and dumped it off the bridge. (Tr. 327–29). A short time later, Smith gave Jackson a similar account of the killing. (Tr. 329–30). When Jackson visited Smith's apartment, he noticed red stains on the bathroom tiles and saw that the shower curtain was missing. (Tr. 331–32).

On April 29, 1983, Barry Wilson's body was recovered from the Hutchinson River. (Tr. 2193–94; GX 151A–D). The body was wrapped in plastic bags and a shower curtain and displayed a deep wound to the neck. (Tr. 2195–96, 6532; GX 151A–D, 181). Eugene Romero bears a raised scar across the palm of his right hand. (Tr. 6826–30; GX 130, 131).

#### d. The Murder of Steven Ash

A few months after the murder of Barry Wilson, Steven Ash contacted James Jackson and told Jackson that he did not know who had killed his sister and that his "lieu-tenant," Barry Wilson, was missing. (Tr. 343–44). Ash gave Jackson his beeper number, which Jackson passed on to Romero. (Tr. 334–35). A few days later, Romero contacted Jackson to inform him that Ash was on his way to an apartment located at 3535 Rochambeau, which the racketeers had used as a mill and a stash pad. (Tr. 335–36). At that time, the apartment was being occupied by two women who processed heroin for the enterprise, Adrienne Holiday and Karen Jenkins, and their daughters. (Tr. 335–36, 1688, 1688–99, 4600–02).

At Romero's direction, Jackson picked up Holiday, Jenkins and their children and took them to a hotel. (Tr. 335–37, 1704–06, 4602–05). By that time, Romero and his girlfriend, Sharise Walker, and Raymond Clark had arrived at the apartment. (Tr. 336, 1704–06, 4602–04).

After Jackson had left with Holiday, Jenkins and the children, Ash was ushered into the bedroom, where Romero was sitting at the edge of the bed. (Tr. 341). Clark came up behind Ash and shot him in the head. (Tr. 342). Romero and Clark placed the body into garbage bags with weights from a gymnastics set they had found in the apartment, and they placed the body in the trunk of a car. (Tr. 342–43, 1689, 4601–02). Raymond Clark later bragged to Jackson that he, and not Romero, had carried the body down to the car. (Tr. 343). On June 9, 1983, Ash's body, wrapped in blankets and plastic, was discovered floating near Pier 42 at Norton and West Streets. (Tr. 4486–90; GX 178A–F). The cause of death was a bullet wound to the head. (Tr. 6532; GX 180). Raymond Clark acknowledged in 1987 to Larry Taylor, with whom he had dealt cocaine, that he had killed Beverly and Steven Ash, although he said that he had been reluctant to kill Beverly Ash because he liked her. (Tr. 6087–93, 6097–100).

#### 4. Jackson Runs the Enterprise When Romero Leaves New York.

##### a. Romero Puts Jackson in Charge.

After the murder of Steven Ash, Romero decided to leave New York because there were criminal cases pending against him. (Tr. 344).* At that time Romero made Jackson his partner, sharing profits on an even basis, and instructed him about how to pick up heroin and make payments to Reiter. (Tr. 344–45). Romero told Reiter that Jackson would now be making pick-ups of drugs and deliveries of money, and Romero also told the crew that Jackson was in charge. (Tr. 344–46). Raymond Clark, Leonard Rollack, and Timothy Smith, among others, were all present when that announcement was made. (Tr. 346, 410). In August or September of 1983, Romero accompanied by Raymond Clark, left New York for Detroit. (Tr. 347).

Jackson stayed in New York with the new responsibility of meeting with Reiter every week to keep the crew supplied with heroin. (Tr. 347–48). The arrangement with Reiter was that Jackson would either pick up heroin or make a payment, but that he would never do both at the same meeting. (Tr. 348). The meetings usually took place in the vicinity of 2nd Avenue and the 60's in Manhattan, and Reiter was often accompanied by Billy "White Hair" Battista. (Tr. 348–49). Reiter frequently received payments directly from Jackson, but deliveries of drugs were always made by Reiter's companion. (Tr. 349). Over the next few months, Jackson received approximately four kilograms of pure heroin from Reiter at a cost of $240,000 per kilogram. (Tr. 350). Reiter supplied Jackson with heroin on a consignment basis, and a new package of heroin would not be delivered unless the debt for previously-delivered heroin was no greater than approximately $50,000. (Tr. 344–45, 350).

During that period, Jackson had numerous meetings with Smith, to whom he distributed approximately 500 "quarters" of heroin each week. (Tr. 416). Jackson also had several meetings with Rollack during which he gave Rollack heroin or received payment from him. (Tr. 412–13). Ultimately, Rollack fell into debt and owed Jackson approximately $12,000 for two ounces of pure heroin that Jackson had given him. (Tr. 411–13). Jackson also visited an apartment with Rollack that Rollack was using as a stash pad. (Tr. 413–15). In that apartment, Jackson observed 10 to 15 "bundles" of heroin, each bundle containing 10 quarters. (Tr. 414). Rollack's sister, Winnie, indicated that she was responsible for "bagging" the heroin for Rollack. (Tr. 414–15).

##### b. The Attempted Homicide of James Pridgen

In 1983 Smith and Jackson saw James Pridgen in the Players Club in Manhattan, and Smith, who still believed that Pridgen had earlier ordered Bailey to kill him, see pp. 11–12 supra, decided to "move on" Pridgen. (Tr. 251–53). Jackson supplied Smith with a gun and instructed Adrienne Holiday, the woman who packaged heroin for the enterprise and who was present at the social club that night, to retrieve the gun after Smith had used it. (Tr. 253–54, 4606–08). A short time later, Smith fired several shots at Pridgen, who was hit and fell across the table where he had been sitting. (Tr. 254, 4608–10). The racketeers later learned that Pridgen had been

---

* In November of 1981, Detective Cattrano arrested Romero for driving a vehicle with an altered "VIN" number and for possession of narcotics and a gun. (Tr. 5516–17). Romero subsequently jumped bail on those charges. (Tr. 5518).

paralyzed but not killed. (Tr. 255–56, 1798, 4613).

After the shooting, Holiday dropped the gun Smith had thrown towards her, and she left the club with Jackson and Smith, who used separate cars. (Tr. 254–55, 4610–11). Smith was angry at Holiday for having dropped the gun, and he feared that the gun might have his fingerprints on it. (Tr. 255, 4611–12). Holiday accompanied Jackson and Smith to another discotheque and, still upset, visited her friend Karen Jenkins, to whom she described the shooting she had just seen. (Tr. 255, 1797–1800, 4612–13).

### 5. Jackson Becomes The Sole Leader of the Enterprise.

#### a. Jackson and Romero Dissolve Their Partnership.

On one occasion, Romero sent his girlfriend Sharise Walker to New York to meet with Jackson. (Tr. 418). That week, Jackson, following Romero's directions, gave Walker the approximately $200,000 that was to be paid to Reiter and also provided her with a quarter of a kilogram of pure heroin. (Tr. 418–20). The following week, Sharise Walker visited Jackson again and for a second time took possession of the week's cash proceeds. (Tr. 420).

In October of 1983, following Sharise Walker's second receipt of cash from Jackson, Romero came to New York and met with Jackson. (Tr. 420–21). Romero criticized Jackson for being behind in payments but refused to listen to Jackson's explanation. (Tr. 421). At a meeting of the crew at which Raymond Clark, Leonard Rollack and Timothy Smith, among others, were present, Romero announced that he and Jackson were no longer partners and that he would resume the direction of the enterprise. (Tr. 421–22). For about a month thereafter, until Romero again left New York for Detroit, Romero supplied the crew with heroin. (Tr. 422).

Meanwhile, Jackson became partners again with Steven Cobbs and, after initially receiving heroin from Romero, found a new source of supply named "Omar." (Tr. 422–23). During that time, Mark Reiter had a "dry" period and could no longer supply heroin for Romero to distribute to his workers. (Tr. 422–23). Jackson thus supplied Romero's "crew" and, when Romero later returned again from Detroit, he became Jackson's "lieutenant." (Tr. 423–24). In addition to "Omar," Jackson also received heroin on occasion from William Underwood and Ronald Basket. (Tr. 425–27).

In the spring of 1984, Reiter contacted Jackson and arranged a meeting, at which Billy "White Hair" Battista was also present. Reiter announced that he was willing and able to supply heroin to both Jackson and Romero, each of whom, by that time, had his own crew. (Tr. 430–31). Jackson's crew, which included Smith, Dicks and Joseph Bethea, among others, was distributing substantial quantities of heroin on 117th Street in Manhattan, in Father Panik and P.T. Barnum Projects in Bridgeport, Connecticut, and at other locations in New York and in Virginia. (Tr. 430–33, 1425–38). During the summer of 1984, on one occasion Jackson distributed 500 quarters of heroin to Smith, 250 quarters to Robert "J.R." Thompson, 500 quarters to Dicks, and various other amounts of heroin to other crew members. (Tr. 436–39).

Later in 1984, after one of Jackson's suppliers was arrested, Jackson went to a boutique called Gianpietro's near Mark Reiter's apartment and told its owner, Mike Levy, that he needed to contact Reit-

er. (Tr. 445, 482, 4039–40). Levy left the boutique and returned, saying that Reiter would arrive shortly. (Tr. 446). Sometime later, Reiter arrived, and Jackson told him that he did not "want to be involved with Romero" and that he wanted his "own work." (Tr. 446). The next day, Reiter, accompanied by Battista, agreed to give Jackson half a kilogram of heroin on consignment for $120,000, and Battista handed Jackson the package. (Tr. 446–47). Thereafter, until about May of 1985, Jackson received approximately half a kilogram to a full kilogram of heroin per month from Reiter, with the meetings occurring in Manhattan in the east 50's or 60's. (Tr. 447–48). At around that time, Jackson, who had previously arranged for the "cutting" and packaging of the heroin into quarters, started distributing pure heroin to his crew members, including Smith (Tr. 452, 1673–82, 1712, 4584–95),* and Rollack, who was the first recipient of "pure" from Jackson. (Tr. 620).

In November of 1984, Jackson held a large birthday party in the Bronx at the Stardust Ballroom, a nightclub and catering establishment run by Edward Jackson (who is not related to James Jackson). (Tr. 448–50, 1437–38, 3234, 3268–69; GX 86, 328). Among the people who attended were Smith and Dicks. (Tr. 449). At around the time of that party, Jackson met with Dicks, who informed Jackson about trouble he was having with competing drug dealers in Bridgeport, and Jackson provided Dicks with an eighth of a kilogram of pure heroin on a consignment basis. (Tr. 450–52).

Early in 1985, Jackson was the target of an unsuccessful shooting in the vicinity of Arthur's Roundtable, a bar in the Bronx.

(Tr. 454–55, 3245–46). Jackson contacted a co-racketeer, Gregory Berry, and asked him to find out who was responsible for the shooting. (Tr. 455–56). Berry subsequently told Jackson that Frank Nitty was responsible, and Jackson paid Berry $5,000 to have Nitty killed. That murder was accomplished by one of Berry's confederates, Sam Cooper. (Tr. 456–57). At around the same time, Jackson ordered the murder of James "Boo" Simmons, who had transported heroin to Bridgeport, Connecticut. (Tr. 459–61). Simmons was killed by Ted Key and "Buzz" at Jackson's direction because Jackson believed that Simmons was a heroin user and had stolen an eighth of a kilogram of heroin from Jackson's stash pad. (Tr. 459–61).

### b. The Shootout in Bridgeport, Connecticut

During 1985 Jackson was meeting with Dicks on a weekly basis, either to supply Dicks with heroin or to receive money from him. (Tr. 463–64, 3691–92). Many of those meetings occurred at the Afro-American Bar, and one of them was witnessed by Robert Thompson. (Tr. 464, 3246–50). In February of 1985, Jackson and Berry traveled to Bridgeport to supervise the enterprise's operations after learning from Jerry Davis, a worker there, that rival drug dealers were trying to expel Jackson's workers from the Father Panik Projects. (Tr. 464–69, 3689). Dicks obtained and furnished a condominium for Jackson and Berry in exchange for Jackson's reducing Dicks' debt to him. (Tr. 465–68). Jackson and Berry visited the Father Panik Projects and were surrounded and threatened by a rival crew. (Tr. 468–69).

---

* Karen Jenkins and Adrienne Holiday, who had previously processed heroin for Jackson and Stephen Cobbs from 1980 through 1984, began working for Smith in late 1984. (Tr. 1673–82, 1708–15, 4584–95, 4625).

In response to the threat in Bridgeport, Jackson and Berry organized a crew meeting in the Bronx at the Stardust Ballroom. (Tr. 469–70, 3253–55, 6285, 6291). Jackson ordered his crew members to bring weapons, and they assembled a sawed-off shotgun, a Thompson machine gun, two Uzis and four or five pistols. (Tr. 469–70, 3252–53, 6315–16). Among the crew members present, in addition to Jackson and Berry, were Jerry Davis, Robert Thompson and Joseph Sherman. (Tr. 470, 3252, 6316). Joseph Sherman, who distributed cocaine for Berry, told Robert Thompson that "[w]e got a little static up there [in Connecticut]" and then criticized Thompson for refusing to accompany the others. (Tr. 3253).

After the organizational meeting at the Stardust Ballroom, Jackson, Berry and other crew members drove up to Bridgeport, where they assembled and met Dicks at Mr. D's, a bar run by the Dicks family and located near the Father Panik Projects. (Tr. 432–33, 470–71, 2818–19). When Jackson and Berry were unsuccessful in locating the people who had confronted them, they told the crew to reassemble the next morning. (Tr. 470–71). At that time, Dicks volunteered to participate, but Jackson refused his offer. (Tr. 471). The crew then entered the Father Panik Projects, positioned itself at various locations, and opened fire on the rival crew. (Tr. 471–72). Jackson saw one man fall. (Tr. 472). Jackson's crew then went back to Dicks' bar, where the men left their arsenal of weapons for about a week. (Tr. 472–73). Dicks told Jackson a few days later that one of Jackson's workers in Bridgeport had been killed in retaliation by the rival group. (Tr. 474).

At around the time of that Bridgeport shootout, Gregory Berry decided to start selling cocaine exclusively and ceased purchasing heroin from Jackson. (Tr. 476). Jackson gave Berry permission to distribute cocaine to his crew so long as it did not affect heroin sales, and Jackson saw Berry delivering cocaine to Dicks and Joseph Sherman, among others.* (Tr. 476–78). Jackson also told Bethea that quantities of cocaine were available from "his man Berry" and mentioned to Karen Jenkins that Berry was his source for cocaine. (Tr. 1489, 1722–24). About a month after the Bridgeport shootout, Berry once again enlisted Sam Cooper to execute a murder for Jackson. (Tr. 496). The victim was Marion "Baby" Robinson, whom Jackson suspected of being an informant and whom Cooper shot outside the Oasis Bar. (Tr. 495–97, 3529–35). Jackson gave Berry $5,000 to pay to Cooper for this murder, but Berry, who used an intermediary, Elvornia Myles, to deliver the payment, apparently only paid Cooper $1,000. (Tr. 497, 3535–37).

### 6. Narcotics Activities of Jackson's Enterprise in 1985 and 1986

In early 1985 Jackson regularly obtained his heroin from Mark Reiter, although he also knew some "African" suppliers from whom he obtained approximately 2½ kilograms of poor quality heroin. (Tr. 480–81, 486–87). In around April of 1985, Reiter introduced Jackson to Vito Loiacono, who Reiter said would replace Battista. (Tr. 486–88; GX 70). Among Jackson's distributors at that time were Robert Thompson, Cherie Sloan and Anthony Osborne. (Tr. 3681–82). Jackson also sold heroin to Ronald Maxwell, a/k/a "Ronald Conquest," whom Jackson had met at Gianpietro's. (Tr. 481–86; GX 72). Maxwell later com-

---

* Dicks subsequently approached Jackson to enlist his aid in getting Berry to reduce the price he was charging for cocaine, but Jackson refused to get involved. (Tr. 479).

plained to Jackson that Reiter had refused to refund $30,000 that Maxwell had paid to Reiter for heroin that was too low in quality to sell. (Tr. 514–15).

After about May of 1985, Reiter was no longer able to supply Jackson with heroin, but, in a conversation at a restaurant in September or October of 1985, Reiter reassured Jackson that he would soon have "more than enough drugs." (Tr. 491–92). In late 1985 Jackson contacted Reiter after learning of the murder of Paul Castellano,* and Reiter told Jackson that "[e]verything is going to be all right. You'll be hearing from me soon." (Tr. 498). A few weeks later, Jackson met with Reiter and Loiacono and received half a kilogram of heroin. (Tr. 501–03). Reiter also agreed to reduce Jackson's price from $240,000 to $200,000 per kilogram. (Tr. 503, 506). In 1986 Jackson met with Reiter and/or Loiacono on a weekly basis, either to pick up heroin or to pay for it. (Tr. 506–07). Jackson then distributed that heroin to members of his enterprise, including Dicks, Bethea, and Thompson, for redistribution in New York, Connecticut, Virginia, and Boston. (Tr. 508–09, 1433–34, 1491–94, 3691–94, 3700–02).

In the summer of 1986, Jackson promoted his nephew Russell Fleming to be "lieutenant" in the organization. (Tr. 511, 3697, 3704–05). Fleming had previously assisted Jackson during vacations from college in delivering heroin and picking up payments. (Tr. 510, 3680–97). Perceiving that law enforcement efforts against him were increasing, Jackson decided to go to Virginia to "cool off," and before doing so, he introduced Fleming to Reiter and Loiacono. (Tr. 511–12, 3705–10, 4099–101). Although Jackson came back to New York occasionally, he spent most of his time between the summer of 1986 and the end of the year in Virginia, where he sold heroin with Bethea; and, during his absence, he consulted with Fleming on a daily basis while Fleming ran Jackson's narcotics enterprise. (Tr. 530–31, 1491–92, 3719–20). Fleming had approximately half a dozen meetings with Loiacono to pick up heroin or make payments for it. (Tr. 3712). Fleming also met once alone with Reiter to tell him that Jackson was out of town and had to postpone paying Reiter. (Tr. 3714–16).

### 7. The Demise of Jackson's Enterprise

In February of 1987, Jackson was arrested on this case and incarcerated at the Metropolitan Correctional Center ("MCC"). (Tr. 533). At the time of his arrest, he owed Mark Reiter approximately $140,000. (Tr. 533). In the MCC Jackson was approached by Angelo Ruggiero, who was also an inmate and who told him that they had a mutual friend—Mark Reiter. (Tr. 533–34). Needing to raise money to pay his retained lawyer, Robert Simels, Jackson instructed Fleming to contact Reiter to obtain additional heroin. (Tr. 536–38). When Fleming reported that Reiter had refused to help, Jackson sought assistance from Ruggiero, who later told Jackson that he had contacted Reiter about the matter. (Tr. 538–39). On a subsequent visit, Fleming told Jackson that Reiter had now agreed to provide more "work." (Tr. 539–40). Fleming subsequently obtained an eighth of a kilogram of heroin from Reiter, which Fleming split into three packages. (Tr. 540–41, 3738–39, 3743–45). A short time later, Fleming too was arrested. (Tr. 542, 3738).

In around May or June of 1987, Ruggiero introduced Jackson to a private investi-

---

* An objection to references to Castellano was sustained by Judge Owen, and the murder was subsequently referred to as "a news event." (Tr. 498–501).

gator named William Sewell. (Tr. 586). Sewell was hired by Jackson, Dicks and Anthony Mackenzie in an attempt to obtain information about Berry, whom they suspected of being a prosecution witness. (Tr. 602–05). In September of 1987, when Jackson had decided to cooperate with the Government, but before his cooperation had become public, Rollack told Jackson during a visit, in words that later proved true, that he (Rollack) would jump bail and not be present at trial. (Tr. 605–07). After Rollack did in fact flee, it was not until mid-trial that he was again arrested. (Tr. 6013–14).

### 8. The Origins of Reiter's Continuing Criminal Enterprise

#### a. Reiter Enters the Heroin Business.

Just as Jackson was cementing his power and profits as the eventual head of his heroin distribution organization from 1980 through 1987, so too was Jackson's supplier Reiter building his own enterprise during roughly the same time period. Reiter was introduced to the heroin business in around 1980 by Herbert Sperling, who, through Nicky Barnes, facilitated the introduction of Steven Ash to Reiter. (Tr. 4201). Prior to that time, Reiter had been involved in "chopping," (i.e., dismantling) cars and in relatively small-scale cocaine sales. (Tr. 4021–24). In 1978 Reiter employed Vito Loiacono to store cocaine and to find customers willing to buy cocaine in quantities from an eighth to a quarter of a kilogram. (Tr. 4022–25). Reiter also purchased small amounts of cocaine from Salvatore Corallo, who was himself a small-scale cocaine dealer (Tr. 2210–13, 2215–16, 2458, 2466–67), and once helped finance Corallo's purchase of $8,000 dollars' worth of cocaine. (Tr. 2218–20). In 1980 Corallo learned that Reiter was in the heroin business when Reiter urged him to accompany a shipment of heroin from Italy to New York. (Tr. 2222–23). After discussing the offer with his wife, Corallo decided not to accept it. (Tr. 2223).

As Corallo fell into debt to Reiter in the fall of 1981, Reiter used Corallo to store heroin, which Corallo initially hid in his mother's apartment. (Tr. 2225–29). Reiter also introduced Corallo to Battista, who delivered to Corallo the first package of heroin that Corallo stored and who later retrieved that package. (Tr. 2225–27). At around that time, Reiter also taught Corallo how to cut, package, and test heroin and how to count large amounts of money quickly. (Tr. 2226–27, 2230–32, 2281). In January of 1982, Reiter had Corallo store two kilograms of heroin in Reiter's house in Brooklyn and told Corallo that he would pay off Corallo's "shylock" debts and compensate Corallo $500 dollars for each kilogram of heroin delivered to a white customer and $2,500 dollars for each kilogram delivered to a black customer. (Tr. 2233–35).

Corallo worked for Reiter in the heroin business until June of 1982, when Reiter directed him to "lay low" because "[t]hings are getting hot." (Tr. 2296–97). Corallo's responsibilities were "to test, package heroin, weigh heroin, deliver heroin and collect cash from the sales of those heroin deals." (Tr. 2235–36). In October of 1982, Corallo was arrested on federal charges of conspiring to distribute heroin in a case that also named Mark Reiter as a defendant. (Tr. 2298–99). During the period prior to his arrest, Corallo had delivered a quarter of a kilogram of heroin to Albert La Rocca, a full kilogram to John Perrone, and a total of five kilograms to Eugene "Mike" Romero, who had introduced Corallo to James Jackson. (Tr. 2238–47, 2250, 2255, 2285–86; GX 76, 87). Reiter also introduced Corallo to Steven Ash and, at

Reiter's direction, Corallo gave Ash some cocaine. (Tr. 2282–83). On three occasions, Corallo delivered heroin to Thelma Grant, who was Nicky Barnes' common law wife and who was named as a defendant in the case against Corallo. (Tr. 1851, 2693, 2724, 2754). In addition to distributing heroin for Reiter, Corallo accompanied Battista when Reiter ordered Battista to pick up heroin from Salvatore Greco (Tr. 2284–85, 2290, 2292), and accompanied Reiter when Reiter delivered half a million dollars in cash proceeds of heroin sales to John Carneglia. (Tr. 2293–95, 2731–32).

### b. Reiter's 1983 Arrest and Acquittal

In April of 1983, Reiter was arrested and charged with participating in the heroin conspiracy with which Corallo had previously been charged. (Tr. 2708–09). Reiter, who had previously given Corallo money to help defray his legal expenses, now attended joint defense meetings with Corallo and his lawyer, Al Christenson. (Tr. 2299–2300, 2710, 2744–45). At around that time, Corallo was secretly recording telephone conversations on his home answering machine, and in 1987 Corallo turned those tapes over to law enforcement authorities. (Tr. 2400–29, 2747–51; GX 604, 605, 606, 615). One of those tapes included a conversation with Reiter in which Reiter offered Corallo $30,000 to plead guilty in the case. (Tr. 2414–22, 2713–15; GX 606). Corallo subsequently did plead guilty before the Honorable Mary Johnson Lowe to conspiring to distribute heroin and allocuted to the offense in a manner that avoided disclosing Reiter's role in Corallo's heroin distribution to Thelma Grant. (Tr. 2443–51, 2767–68). It was also around that time that Reiter mentioned to James Jackson that he was "on the lam." (Tr. 351). Mark Reiter eventu-

ally stood trial but was acquitted by Judge Lowe pursuant to Fed.R.Crim.P. 29. (Tr. 2251, 2568–69, 2725). Corallo was sentenced to imprisonment for a term of three years and was released from jail on October 9, 1985. (Tr. 2301).

It was during the period from 1982 through 1983, when Corallo was in frequent contact with Reiter, that Reiter ordered Romero and Jackson to murder Beverly and Steven Ash. See pp. 17–18 supra. Present at that meeting with Jackson and Romero was Battista, who had begun working for Reiter in April of 1982. (Tr. 2255–58, 316–19, 343, 348–49). Battista was present with Reiter on approximately ten occasions when Jackson picked up heroin or delivered money. (Tr. 349–50). Battista also worked with Corallo in performing tasks for Reiter, including storing and making deliveries of heroin and transferring cash payments. (Tr. 2225, 2227–30, 2255–60, 2281–87, 2289–90, 2295, 2709–10, 2713). One of the telephone conversations that Corallo recorded was a discussion between Corallo and Battista about the difficulties in working for Reiter. (Tr. 2399–2411; GX 615).

### c. Reiter Recruits Vito Loiacono.

In late 1983, Vito Loiacono, who had just been released from prison and who had known Reiter since 1975, approached Reiter and asked to work for him. (Tr. 4021–22, 4025–27). Reiter agreed to have Loiacono work with Battista, who was already "distributing the heroin for Mark, pick[ing] up money, set[ting] up appointments, pick[ing] up the drugs and stor[ing] it." (Tr. 4028). Shortly thereafter, Loiacono accompanied Battista in making a heroin delivery to Jackson. (Tr. 4030–31, 4034). In subsequent months, Loiacono also made deliveries to Warren Tyson, a/k/a "Otis," and to Peter Monsanto. (Tr. 4035–39, 4071–72; GX 82). The meeting with Mon-

santo took place at Gianpietro's boutique; and Reiter explained that Mike Levy, the owner of Gianpietro's, had introduced Reiter to Monsanto. (Tr. 4039–40). Loiacono ceased working for Reiter for a period of time in 1984 after Battista complained that "there was no sense in both [workers] getting arrested for the same thing, when God forbid only one could go." (Tr. 4042–43).

In 1985 Reiter separately informed both Jackson and Loiacono that Battista was no longer working for him, and he explained to Loiacono that Battista was an informant. (Tr. 487, 4044). Loiacono immediately resumed working for Reiter, storing, processing and delivering heroin and collecting payments. (Tr. 4045–48).

### 9. Narcotics Activities of Reiter's Enterprise from 1985 through Early 1987

Between 1985 and 1987, Loiacono distributed heroin on a regular basis to various of Reiter's customers. Those customers included a black male whom Loiacono knew as "Willie" and who received an eighth of a kilogram of pure heroin. (Tr. 4049–50). Peter Monsanto was also a customer and he received an eighth of a kilogram on approximately five occasions, twice at Gianpietro's. (Tr. 489–91, 4052–55). Another customer, Eric Von Zipp, was recruited for Reiter by Jackson and was given an eighth of a kilogram by Loiacono. (Tr. 528–30, 4051–52, 4089; GX 116). Jackson was subsequently enlisted by Reiter to help collect overdue payments from Von Zipp; and, to accommodate Reiter, Jackson once drove Von Zipp to a meeting with Reiter. (Tr. 526–30). Loiacono also made deliveries to Mitchell Jackson, a/k/a "Red Jack," who Reiter said had been recommended by Jackson. (Tr. 4078–82; GX 65). Jackson had in fact been asked by Reiter whether "Red Jack" was a "mover," but Jackson had asked Reiter not to serve as his supplier. (Tr. 492–95). Reiter ignored Jackson's request, and Loiacono ultimately supplied "Red Jack" with 12 to 18 deliveries of pure heroin in quantities ranging from a quarter of a kilogram to a full kilogram per delivery. (Tr. 4081–83). After the first delivery, "Red Jack" received Reiter's heroin on a consignment basis and periodically made cash payments to Reiter ranging from $80,000 to $150,000. (Tr. 4081–84).

Another major customer of Reiter's whom Loiacono supplied at Reiter's direction was Ronald Conquest (Ronald Maxwell), known to Loiacono as "Ronny." (Tr. 4072–75; GX 880E). Loiacono made approximately eight or nine deliveries to Conquest, frequently at Gianpietro's, of an eighth of a kilogram of heroin each time. (Tr. 4073–75). Those deliveries were interrupted for a month when Reiter learned that Conquest had a second source of supply and were ultimately terminated when Conquest was arrested in 1987. (Tr. 4076–78).

Warren, Tyson, a/k/a "Otis," to whom Loiacono had first delivered heroin in 1983, received on a consignment basis in the period from the summer of 1985 to October 1987, approximately a dozen packages of heroin ranging in quantity from an eighth to a quarter or half of a kilogram. (Tr. 4035–39, 4071, 4085–89). Reiter told Loiacono that he had obtained "Otis" as a customer through the efforts of Jackson's partner, "Mikey" [i.e., Eugene Romero]. (Tr. 4086–87). Reiter also noted that "Mikey" had been one of his best customers and directed Loiacono to tell "Otis" to get "Mikey" a lawyer when "Mikey" was later arrested. (Tr. 4089–91).

Of course, Loiacono also participated at Reiter's direction in the delivery of vast quantities of heroin on a consignment basis

to Jackson, including packages weighing up to an entire kilogram. (Tr. 501–19, 616–17, 4093–99). Loiacono also made several deliveries of heroin to Jackson's nephew Fleming and received cash payments from Fleming during the period when Fleming was managing Jackson's organization. (Tr. 3707, 3709–12, 4101–03).

### 10. Corallo Rejoins Reiter's Enterprise.

Salvatore Corallo was released from prison on October 9, 1985, and resumed his small-scale cocaine dealings. (Tr. 2301, 2303–04). For about a year and a half, Corallo and Reiter had only sporadic contact, largely involving purchases by Reiter of small amounts of cocaine from Corallo. (Tr. 2304–08). In January of 1987, Corallo purchased an ounce of heroin from Reiter, which Corallo intended to redistribute to a contact he had made in jail. (Tr. 2308–09). After Loiacono had delivered the ounce of heroin to Corallo, Reiter called Corallo and asked to visit Corallo in Corallo's apartment. (Tr. 2310). Reiter, accompanied by Loiacono, brought with him two samples of heroin, on which he asked Corallo to perform an "acid test" and a "melting point test." (Tr. 2310–12, 4141–44). For a period of three or four months thereafter, Reiter continued to employ Corallo to test his heroin. (Tr. 2312–13).

By the summer of 1987, Reiter started using Corallo more extensively in his heroin business, arranging for Corallo to store four kilograms of heroin at his residence and asking Corallo to pick up heroin in Newburgh, New York. (Tr. 2313–16, 4159–60). Reiter also enlisted Corallo to deal with a troublesome heroin customer named "Ricky," who was refusing to buy from Reiter because of an earlier dispute. (Tr. 2320–21, 4116–17). Reiter, who could not use Loiacono as his courier because

"Ricky" knew that Loiacono worked for Reiter, instructed Corallo to meet Reiter and a woman named Cathy Burke at a specified restaurant. From there Burke would accompany Corallo to meet "Ricky." (Tr. 2321, 4116–17). At the restaurant, after Reiter had instructed Burke about how she was to introduce Corallo to "Ricky," Burke led Corallo to a nearby street corner, where she made the introduction. (Tr. 2323–25). Following Reiter's directions, Corallo offered to sell "Ricky" half a kilogram of heroin on a cash basis for $95,000 or a full kilogram on a consignment basis for $210,000. (Tr. 2324). The next day, "Ricky" purchased half a kilogram from Corallo, and a few days later, he purchased an additional half a kilogram. (Tr. 2324–27). Corallo stored the $190,000 in cash proceeds from the sale at his residence until, at Reiter's direction, he turned over the cash to Loiacono. (Tr. 2326–27, 2332–34). Loiacono, who first met "Ricky" at Cathy Burke's house, had previously distributed half a kilogram of heroin to "Ricky" and had collected a cash payment of $50,000, which he had taken to Reiter's apartment. (Tr. 4114–17). Corallo made a number of telephone calls to Reiter about his dealings with "Ricky," whom he referred to as "Cherry Lime Ricky." (Tr. 2328). A few months later, "Ricky" contacted Corallo to purchase additional heroin, but Corallo refused because he could not contact Reiter to get approval for the transaction. (Tr. 2329). In a recorded telephone conversation between Loiacono and Reiter on August 1, 1987, Loiacono relayed a message from Corallo to the effect that Reiter had "missed out on a 'Cherry Lime Ricky.'" (GX 918A).

During that same period of time, Reiter had obtained a new customer known as "Jazz" or "Shorty" Hayden. (Tr. 4109, 4114; GX 64). Hayden made purchases of

heroin on three occasions totaling half a kilogram, with the final two purchases made on a consignment basis. (Tr. 4112–14). The purchases ceased when Hayden was arrested. (Tr. 4113–14). An additional customer, Alan Morris, who was known as "Whirl" or "World," received on two occasions a total of a kilogram and a half of heroin from Loiacono. (Tr. 2341–43, 4122–29). Loiacono also delivered an eighth of a kilogram of heroin to Jackie Monsanto, who was the wife of Peter Monsanto. (Tr. 4117–21).

### 11. The Demise of Reiter's Enterprise

In February of 1987, Loiacono learned from Reiter that Jackson had been arrested. (Tr. 4103). Prior to Jackson's decision to cooperate in this case, through the intervention of fellow MCC inmate Angelo Ruggiero, Reiter had agreed to help Jackson raise his attorneys' fees by supplying Fleming with an eighth of a kilogram of heroin. *See* pp. 29–30 *supra.* However, on September 2, 1987, immediately after Jackson had been transferred out of the MCC, realizing that Jackson had begun to cooperate, Ruggiero telephoned Reiter collect from the MCC. Ruggiero told Reiter to "[g]et a lawyer ... '[c]ause the guy left the building, today.... They know the whole story.' " (GX 966).

Shortly thereafter, Reiter, who was being surveilled, met with Loiacono and Cathy Burke in the vicinity of Reiter's apartment near 59th Street and Second Avenue in Manhattan and told Loiacono that Jackson had become an informant. (Tr. 4160–62). Reiter directed Loiacono to warn "Otis" and "Red Jack" that Jackson "had turned." (Tr. 4162). Reiter also accompanied Loiacono to the meeting with "Otis," which occurred that same evening in the vicinity of 79th Street between First and York Avenues. (Tr. 4162–64).

Over the Labor Day weekend that followed Ruggiero's telephone call, Reiter also arranged to meet his customer Alan Morris, a/k/a "Whirl" or "World." (Tr. 4165–66). Surveillance agents monitored various meetings at two different hotels attended at one time or another by Reiter, Cathy Burke, Alan Morris, and two associates of Morris. (Tr. 4838–50, 5363–73, 5696–5700, 5999–6003, 6560–65). Those agents also overheard references to a price of $700,000 or $790,000 and to the deal being delayed. (Tr. 6001–02, 7995–8002). Reiter told Loiacono that "he felt there were agents all around" and that "he was taking off, he couldn't afford to get indicted because of Jackson and he was going to leave." (Tr. 4166, 4165).

A few days later, Reiter, who was in Florida, had a telephone conversation with Loiacono in which he directed Loiacono to obtain false identification documents and to make travel arrangements so that Reiter's son, Greg, could come to Florida. (Tr. 4167–69). Loiacono picked up the false identification documents from Cathy Burke's house, and, after he had done so, he delivered them to Greg Reiter. (Tr. 4168–69, 4171–72). During that meeting with Reiter's son, Loiacono confronted him with the fact that he had not fully cleaned out his father's apartment, as instructed. Loiacono had earlier gone to the apartment, also with instructions to clean it out, and had found certain papers and a gun still there. (Tr. 4171). Greg Reiter had also been instructed by his father to contact Corallo and convey the message that Corallo was to "[g]ive Vito anything he wants" and to ask for the number of a public telephone where Reiter could contact Corallo. (Tr. 2335–36). Corallo, who was still storing heroin for Reiter, gave one package to Loiacono in September and

another in October. (Tr. 2340–45). The October package contained half a kilogram of heroin, which Loiacono delivered to one of Morris's or "World's" confederates in Detroit. (Tr. 2343–45, 4176–77). Loiacono received $20,000 from "World's Man" in Detroit, which Loiacono immediately delivered to Reiter, who was then in Los Angeles. (Tr. 4177–78).

During the period after Reiter fled from New York, Reiter learned that Fleming had been arrested and was also cooperating with the Government. (Tr. 4172). Reiter instructed Loiacono to contact "Otis," whose wife's mother knew Fleming's mother, and to tell "Otis" to kill Fleming. (Tr. 4172). Loiacono conveyed that message to "Otis," who agreed to tell Loiacono if he ever learned of Fleming's whereabouts, but he insisted that Loiacono commit the murder. (Tr. 4173–74). Reiter also approved the delivery to "Otis" on consignment of a quarter of a kilogram of heroin, which Loiacono picked up from Corallo and delivered to "Otis." (Tr. 4174–75). "Otis" ultimately reported to Loiacono that Fleming and his family had moved and could not be found, and Loiacono so informed Reiter when they met later in California. (Tr. 3852, 3962–64, 4173–74, 4178). Reiter was eventually arrested in California on November 18, 1987. (Tr. 5718).

### 12. Reiter's Accumulation and Concealment of Wealth

During the seven years or so of his operation, Reiter charged his black customers approximately $240,000 per kilogram of heroin and his white customers approximately $19,000 per kilogram of heroin. The Jackson organization alone purchased approximately 45 kilograms of heroin from Reiter (Tr. 616), and in addition, Reiter sold more than a dozen kilograms to "Red Jack" and several other large customers. (Tr. 4081–84, 4086–90). Given those enormous revenues, not surprisingly, Reiter accumulated tremendous personal wealth, and also not surprisingly, he went to great lengths to conceal his assets.

Reiter last filed a tax return in 1981, which stated that his adjusted gross income was $13,250 and his taxable income was $9,250. (Tr. 4912–13, 4928). Neither a tax return nor a request for an extension was filed by or on behalf of Reiter for the 1982 tax year. (Tr. 4915). For the tax years 1983 through 1986, requests for extensions were filed, accompanied by estimated tax payments of $7,000 for 1984, $9,000 for 1985, and $4,000 for 1986. (Tr. 4915–27). In 1984 a penalty of $500 was assessed on Reiter for filing a frivolous return. No tax returns at all are on file for Reiter's wife Dolores. (Tr. 4908, 4929).

Records of the Social Security Administration indicate that Reiter was employed by Accessories Specialties, Inc., in Yonkers, New York, from 1976 through 1983. (Tr. 2395, 4958–59). There was, however, no personnel file for Reiter at Accessories Specialties, Inc., nor was Reiter known to Robert Griffin, the company's national sales coordinator during the relevant years. (Tr. 5085–88). According to the records of the Social Security Administration, Reiter's total gross wages for the fourteen-year period from 1973 through 1986 amounted to just under $107,000. (Tr. 4961).

Notwithstanding those IRS and Social Security Administration records showing small earnings through the year 1986, Reiter maintained a lavish personal lifestyle. From at least around 1982 until 1987, Reiter lived in an apartment at 300 East 59th Street in Manhattan, which originally had been designed for Calvin Klein. (Tr. 2392, 4235). The apartment had three rooms, wood paneling and mirrors, and a

bedroom with a glass-enclosed Jacuzzi. (Tr. 2392, 4235–36). The payments from 1983 through 1986, some of which Reiter had made in cash (Tr. 4236, 5619), amounted to approximately $58,000. (Tr. 5614). That apartment, however, was listed in the records of the real estate management firm as being occupied by one Peter King. (Tr. 5614). In one intercepted telephone conversation in which Reiter reported service difficulties to the telephone company, Reiter gave his name as "King." (GX 933).

Reiter's family also had a residence at 3206 Hewlett Avenue, Merrick, New York. (Tr. 2391). That residence, however, had mortgage and insurance documents recorded in the name of one Vincent Balzano. (Tr. 5538–49). Balzano never resided in the house, nor did he make any mortgage or insurance payments on it. (Tr. 5554–56, 5559–60). The homeowner's insurance policy on the house was arranged and paid for by Dolores Reiter but was in the name of Vincent Balzano, who was listed as an owner-occupant. (Tr. 5566, 5568–69). Dolores Reiter told the insurance broker that Balzano, who did not in fact even know Mark or Dolores Reiter, lived in the house with her. (Tr. 5568–69, 5585–86).

Also during that period, Reiter drove a variety of expensive cars, including a four-door black Lincoln, a Cadillac, a 1982 Eldorado, and a black Mercedes two-door convertible SL. (Tr. 2392–93, 4237–38). Reiter told Loiacono that he had paid $50,000 for one car, using a leasing company so that if "anything ever happened, they couldn't take the car." (Tr. 4237–38). In addition to those belongings, Reiter owned two boats, one a 26–foot boat called "the Magnum," and the other an approximately 40–foot white "Fountain" cigarette boat (Tr. 2393–94, 4241–44). The larger boat was a customized model purchased from Reginald Fountain for approximately $132,000. (Tr. 5150). Payments for the boat were also made in cash, with Loiacono flying down to North Carolina to make one payment of approximately $70,000 in cash. (Tr. 4241–42). The cigarette boat was first registered in the name of one Lee Bandrowicz, who had helped arrange the purchase and had initially accepted delivery of the vessel. (Tr. 5094–99, 5107, 5149). Bandrowicz did not want the boat registered in his name, and the registration was thus changed to reflect William Kooiman, Reiter's half brother, as the owner. (Tr. 5108, 5112, 5159–61). Bandrowicz told Fountain that he did not want the boat registered in his own name. (Tr. 5161).

In 1986 Reiter also purchased a Corvette for his son's birthday. (Tr. 520–25, 6320–24, 6342–47). The purchase was arranged after James Jackson drove Edward Jackson to Gianpietro's to meet Reiter. (Tr. 521). There Reiter directed Edward Jackson to put the car in Reiter's wife's name (Tr. 521–23, 6323–24), and gave him a down payment of $5,000 in cash in a brown paper bag. Subsequently Reiter made additional payments of at least $10,000 for the car. (Tr. 6347–57).

## B. The Defense Case

No defendant testified on his own behalf, and only defendants Reiter and Rollack presented any evidence in their defense cases.

### 1. Mark Reiter

Reiter called 23 witnesses in an ultimately unsuccessful effort to rebut the Government's case against him. A number of those witnesses primarily addressed the Government's tax case against Reiter. For example, Robert Giusti, an employee of Barco Auto Leasing, testified that an auto leased by Dolores Reiter from Pisces

Auto Leasing was ultimately purchased outright by Mrs. Reiter for approximately $25,000. (Tr. 7118–23). Murray Appleman, a tax attorney, testified that, having been told by Reiter that Reiter was under investigation for non-tax criminal matters, he had advised Reiter that he should not provide information requested on tax returns but should instead pay estimated taxes and claim a Fifth Amendment privilege. (Tr. 7204–19). On cross-examination, Appleman acknowledged that he had gathered no information from Reiter except that Reiter was under investigation and that he had charged Reiter $500 or $1,000 each year for his services. (Tr. 7231, 7242). Appleman also admitted that he had recommended that Reiter pay $9,000 in estimated taxes in a particular tax year because Appleman was forwarding a check to the Internal Revenue Service on Reiter's behalf and Appleman did not want to fill out a currency transaction report for the cash that Reiter gave him. (Tr. 7241–42).

Also in connection with the tax case, Lisa Cotoggio, an employee at DTF Marina who had been romantically involved with Reiter and who was a cousin of Frank DeStefano, a part owner of DTF Marina, testified in substance that DeStefano had falsified invoices that the Government had introduced into evidence respecting the Fountain power boat. (Tr. 7127–34, 7141–51, 7177; GX 1215, 1216). Cotoggio also stated that she had accompanied Reiter to Fire Island on Labor Day weekend in 1987, when Government witnesses testified that Reiter had been attending numerous meetings in the aftermath of learning that Jackson had become a Government informant. (Tr. 7176). On cross-examination, Cotoggio admitted that she was not employed at DTF Marina during the time periods indicated on certain of the alleged-ly falsified exhibits. (Tr. 7180–84). Cotoggio also stated that she had been asked to testify a few weeks prior to her appearance and had not spoken with Reiter during the intervening period. (Tr. 7188–89).

William Kooiman, who is Reiter's half brother, testified that he was "partner" with Reiter in buying the Fountain power boat, although he contributed no money to the boat's purchase, and that Reiter said that Kooiman "could use [the boat] or share in some time on it." (Tr. 7886–88). On cross-examination, Kooiman stated that he had ridden on the boat only once and that the boat had been registered in his name because it was thought that the boat might eventually be sold in Massachusetts, where Kooiman lives, and because "[i]t has to go in one or the other's name, so we just decided to put it in one name." (Tr. 7890–92). Mary Ann Murphy, an employee of All-state Insurance Company, testified that a particular telephone number listed on Government Exhibit 726 was an office telephone number. (Tr. 7256–57). Edward Jackson had previously testified that the number, which he had written in connection with his arranging the lease of a Corvette for Reiter's son, was Reiter's number. (Tr. 6342–43).

To rebut the Government's wiretap evidence against him, Reiter called Joseph Barrato, chief executive officer of Brioni's Roman Style. He confirmed that "Brioni" is a trade name of a suit, and that the company had four retail outlets in Manhattan. (Tr. 7258–59). In the Government's case, Special Agent Robert Russillo, without contesting that "Brioni" was also the trade name of a suit, had testified that, in an intercepted telephone conversation, "Brioni" was probably being used as a code name for heroin. (Tr. 5734, 5800–01). Edward Siedlick, a licensed private investigator who had listened to and electronically enhanced certain of Reiter's intercepted

conversations, also disputed the transcription and interpretation by Special Agent Russillo of particular tape-recorded conversations. (Tr. 7664–70, 7673–75, 7681–89).

Reiter called numerous other witnesses in an effort to demonstrate that the Government's accomplice witnesses, principally Jackson, Loiacono, and Corallo, were lying. For example, Anita Barretta, who had known Mark Reiter for seven years and had been romantically involved with him, testified that Reiter never drank and often went out of town with her for entire weekends. (Tr. 7766–73). That testimony was offered to rebut Jackson's testimony that Reiter had had a drink during one of their meetings and that he often met with Jackson on Sundays. (Tr. 405–08, 492). Barretta also stated that Reiter was involved with flea markets, which he supplied with factory overruns from warehouses. (Tr. 7783). On cross-examination, Barretta admitted that she had never been to a flea market with Reiter and did not know what flea markets he supplied or where he obtained merchandise. (Tr. 7821–24). She also admitted that she was not sure whether she had spent Labor Day weekend of 1987 with Reiter, nor whether they had gone to Fire Island or the Hamptons. (Tr. 7825–27).

Joseph Sherman, who was serving a jail sentence for a narcotics conviction, testified that James Jackson had told him that he had received his heroin from a Caucasian named "Frankie," whom Sherman had met and who was not Reiter. (Tr. 7847–48, 7850, 7866–67). Sherman acknowledged on cross-examination that he had only seen "Frankie" once, that he had never seen any money or drugs exchanged between "Frankie" and Jackson, and that Jackson may have had other sources of supply. (Tr. 7858–60).

Joseph "Jazz" Hayden testified that he had met Reiter and Loiacono and had asked to borrow money from Reiter, but that Reiter had not made a loan to him. (Tr. 7345–55). Hayden also said that Loiacono had secretly urged him to sell narcotics and that Reiter and Loiacono had had an altercation when Reiter found out what Loiacono had done. (Tr. 7351–54). On cross-examination, Hayden admitted to having been convicted of numerous narcotics offenses and of manslaughter, and he denied his guilt as to all of those offenses. (Tr. 7377–83). Hayden also admitted knowing Rollack, Nicky Barnes, Steve Monsanto, Peter Monsanto, Walter Centano and William Underwood. (Tr. 7383–85, 7390, 7394, 7408, 7479–81). Susan Lobos contradicted previous testimony by Loiacono to the effect that her boyfriend "Wayne" had stolen heroin from Loiacono. (Tr. 7619–22). Lobos admitted on cross-examination that "Wayne" was in jail on a weapons charge. (Tr. 7628).

Joseph Corallo, the son of Salvatore Corallo, stated that his father was in the cocaine and heroin business but that Reiter was "dead set against it" and that his father, therefore, had hid his narcotics activities from Reiter. (Tr. 7899, 7905, 7909). He testified that his father had written him a letter saying that the elder Corallo was trying to help his son in a homicide case pending against the son. (Tr. 7912; Reiter DX F). On cross-examination, Joseph Corallo acknowledged socializing with Reiter's son Greg and testified that he was "like family" with both of Reiter's sons. (Tr. 7930–31). He also stated that Reiter had told him that he worked in flea markets and the construction business. (Tr. 7933–34). Joseph Corallo denied ever having told law enforcement agents that Reiter was involved with heroin. (Tr. 8022).

Reiter also called several law enforcement officers (Tr. 7491–523, 7585–95), and he called other witnesses who refused to testify on the basis of their Fifth Amendment privilege. (Tr. 7266–68, 7232–36, 7342, 7741, 7745–47).

### 2. Leonard Rollack

Special Agent Camille Colon of the Drug Enforcement Administration was recalled by Rollack and questioned about her search pursuant to a warrant of 119 Root Avenue, where Rollack's wife and children were staying at the time Rollack was arrested during the trial. (Tr. 8055–69). Eddie Mustafa Muhammed, a boxer who won the Golden Glove Award in 1971 and 1972, testified that Rollack, with whom he was friends, was a talented boxer and that Rollack had asked to borrow money from him after being released from prison. (Tr. 8083–84, 8090, 8094). Rollack also called Eugene Romero to display his hand. (Tr. 8209). Romero otherwise invoked his Fifth Amendment privilege outside the presence of the jury. (Tr. 8209–10).

Finally, Walter Johnson, who had been incarcerated in Ashland, Kentucky, with Jackson, Rollack and Romero, and who was presently serving a sentence on a narcotics conviction, testified that he had sold drugs on 115th Street between Seventh and Eighth Avenues and that a price dispute had arisen with Norman Bannister. (Tr. 8219–20, 8258–59, 8269–72). Johnson said that, shortly before Bannister was murdered, Jackson had told him that he was going to kill Bannister and later claimed credit for the murder. (Tr. 8277, 8291, 8295–96). Johnson admitted on cross-examination that the source of 100 quarters of heroin that Johnson had

sold to an undercover officer in 1983 was Rollack. (Tr. 8326–27). Johnson further stated that he had obtained drugs on four or five occasions from Rollack for resale on 115th Street in Manhattan (Tr. 8328–29). Johnson further acknowledged on cross-examination that Jackson, Rollack, Romero and Cobbs were all working together and that most of the sales from Rollack to Johnson occurred after the killing of Bannister. (Tr. 8330–31). In addition, Johnson admitted that he had previously lied to prosecutors about the role of a woman named Margie Gates in Jackson's enterprise, and he conceded that it would not have been prudent for Jackson to have told him about the planned killing of Norman Bannister before it happened. (Tr. 8323–24, 8350–51).

### C. The Government's Rebuttal Case

The Government presented three witnesses in a brief rebuttal case. Detective Michael Clark of the New York City Police Department described the circumstances of the arrest of Joseph Corallo for murder and Corallo's postarrest interview.* (Tr. 8428–51). In the interview, Joseph Corallo had acknowledged shooting his murder victim, Joseph Consoleto, twice in the head with a .357 Magnum. He further stated that his father Salvatore Corallo and Mark Reiter were involved in the heroin business and that three kilograms of Reiter's heroin was being stored by his father. (Tr. 8445–49).

Through two additional witnesses, Marco Hernandez, a corrections officer at the MCC, and Anthony Brito, a Special Agent with the Internal Revenue Service, the Government introduced recordings of telephone conversations between Reiter and defense witness Lisa Cotoggio. (Tr. 8518–

---

* The jury was instructed to consider the statements made by Joseph Corallo in the interview only insofar as they had bearing on Corallo's credibility as a trial witness and not to consider the statements for their truth. (Tr. 8456).

48; GX 985 & 986). Those conversations, in which Cotoggio's upcoming testimony was discussed, contradicted Cotoggio's assertion on the stand that she had not consulted with Reiter about her testimony. (Tr. 7188–89; GX 985, 986).

## ARGUMENT

### POINT I

**The District Court Properly Denied Each Defendant's Severance Motion.**

On appeal all defendants except Smith claim that the District Court's denial of their various severance motions was an abuse of discretion. Reiter claims in particular that severance was required because of prejudicial spillover from evidence against his co-defendants and because of conflicting defense strategies at trial. (Reiter Br. at 52–54, 59). Dicks argues that he was entitled to a separate trial because, in comparison with the other four defendants in the case, he played a disproportionately small role in the racketeering enterprise and was the only defendant not charged in a homicide. (Dicks Br. at 39–52). Rollack contends that his severance motion should have been granted because James Jackson was the only prosecution witness to implicate Rollack in Jackson's racketeering enterprise and thus that a separate trial of him would only have taken two days. (Rollack Br. at 29–33). Clark bases his claim on the assertion that there was spillover prejudice because, in contrast to the case against the other defendants, there was no evidence against him of unexplained wealth nor was there any eyewitness testimony about the homicides he committed. (Clark Br. at 12–13). Notwithstanding those specious claims,

Judge Owen acted well within his broad discretion in denying all the severance motions.

### A. General Principles

This Court has repeatedly held that defendants who are indicted together should normally be tried together. *See, e.g., United States v. Ventura,* 724 F.2d 305, 312 (2d Cir.1983); *United States v. Lyles,* 593 F.2d 182, 192 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Borelli,* 435 F.2d 500 (2d Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971). As the Supreme Court recently observed:

> It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometime trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Accordingly, because Rollack sought to offer the statements of his own co-conspirator on his own behalf, he was not entitled to invoke Fed.R.Evid. 801(d)(2)(E). Judge Owen thus properly excluded the hearsay statements of "Sonny." *

---

\* Judge Owen's exclusion was, of course, harmless. Rollack, without Government objection, was able to elicit enough testimony from

Johnson about his conversations with Jackson to allow Rollack's counsel to argue that Jackson had committed the murder.

## POINT V

**The District Court Properly Refused To Direct The Government To Grant Immunity To Numerous Defense Witnesses.**

Clark and Reiter each contend that the District Court's refusal to order the Government to grant potential defense witnesses use immunity violates Due Process and mandates reversal. In particular, Reiter, joined by Clark with respect to the first two witnesses, claims that immunity should have been granted to five potential defense witnesses: Eugene Romero, Ted Key, Ronald Conquest, Renee Gary and Olga Endara. That contention, which is supported neither by the facts nor by the pertinent law, borders on the frivolous. Reiter's and Clark's strategy is transparent: first, they make the highly unlikely claim that their defense is dependent on the testimony of their criminal accomplices and co-racketeers, and then they claim that they have been denied Due Process unless those putative witnesses are given blanket use immunity, thus complicating the Government's prosecutions of those co-racketeers. As is set forth below, Reiter and Clark do not even meet the threshold general showing that is required before a court can grant a defense witness immunity request, nor do they satisfy the particularized elements that must be established with respect to each witness for whom immunity is requested. Accordingly, the District Court was entirely correct in denying their defense witness immunity requests.

### A. The Applicable Law

The right to defense witness immunity exists, if at all, only in "extraordinary" situations, and this Court has uniformly rejected claims for such immunity. *United States v. Turkish*, 623 F.2d 769, 777 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981) (collecting cases); *United States v. Calvente*, 722 F.2d 1019, 1025 (2d Cir.1983), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985); *Grochulski v. Henderson*, 637 F.2d 50, 52 (2d Cir.1980), *cert. denied*, 450 U.S. 927, 101 S.Ct. 1383, 67 L.Ed.2d 358 (1981); *United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir.1979), *cert. denied*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). Where the witnesses for whom immunity is sought are actual or potential targets of prosecution, "trial judges should summarily reject claims for defense witness immunity," *United States v. Turkish, supra*, 623 F.2d at 778, and an immunity request should only be entertained if the court finds that "(1) the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment; and (2) the witness's testimony will be material, exculpatory and not cumulative and is not obtainable from any other source." *United States v. Burns*, 684 F.2d 1066, 1077 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). As is set forth below, there was no discriminatory use of immunity by the Government here, and all of the five witnesses for whom defense immunity was sought were actual or potential targets of prosecution, a status which "warrants summary rejection of a claim for defense witness immunity." *United States v. Todaro*, 744 F.2d 5, 9 (2d Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). Accordingly, Judge Owen did not abuse his discretion in refusing to order the Government to grant the requested immunity.

### B. The Government Did Not Engage In Discriminatory Use of Immunity to Gain a Tactical Advantage.

One of the threshold requirements that the defendants must meet to establish that

a defense witness should be granted immunity is a showing that the Government engaged in discriminatory use of immunity to gain a tactical advantage. While the law is not well-defined as to the precise meaning to be accorded to the phrases "discriminatory use" or "tactical advantage," the record below is plain that the Government made no improper use of its ability to confer immunity. In the course of the trial, the Government presented a total of 60 witnesses, of whom only three, Adrienne Holiday, Karen Jenkins, and Reginald Fountain had entered into agreements providing that they would not be prosecuted for any of the crimes that their testimony disclosed. Both Holiday and Jenkins had served at the lowest levels of the Jackson enterprise, cutting and packaging drugs for a flat salary, while Fountain's testimony disclosed only that he had failed to file Currency Transaction Reports in his sale of a boat to Mark Reiter. Furthermore, unlike the use immunity accorded under 18 U.S.C. § 6003, Jenkins testified pursuant to a co-operation agreement that provided that the Government could, in fact, use her testimony against her if she violated any of the material conditions of that agreement. Only Holiday was accorded complete use immunity, pursuant to 18 U.S.C. § 6003, for her testimony. One government witness, Larry Taylor, testified concerning his narcotics activities with Clark without any immunity or cooperation agreement whatsoever. Taylor stated that he understood that he could be prosecuted for the crimes that his testimony disclosed. (Tr. 6101–02, 6123–24).

In a misleading effort to suggest that the Government engaged in the discriminatory use of immunity, Reiter asserts that "the Government had the benefit of immunized testimony from some fourteen witnesses." * (Reiter Br. at 49). Almost all the witnesses that Reiter alludes to, however, testified under cooperation agreements that are in no way comparable to the use immunity that the defendants sought to have conferred on their witnesses. Indeed, of the 14 so-called "immunized" prosecution witnesses, nine were specifically required under their agreements to plead guilty to one or more criminal charges or had already pleaded guilty to charges relating to the crimes disclosed by their testimony.** Nor is it correct to characterize the testimony of such prosecution witnesses as "immunized," for, unlike with respect to immunity conferred under Section 6003, the agreements under which each testified explicitly provided both that the testimony could be used against the witness if the witness breached any condition of the agreement and that derivative use could be made of information obtained from the witness.

Typical of such cooperation agreements is the one under which James Jackson testified. That agreement provided, *inter alia,* that Jackson would plead guilty to criminal charges exposing him to 45 years of incarceration and $1,000,000 dollars in fines, that he would testify fully and truthfully as requested by the Government and

---

* Notwithstanding Reiter's suggestions to the contrary, there was nothing unfair about the District Court's denial of requests for defense witness immunity, and any abstract prejudice that might result from the denial of immunity was obviated by the District Court's inclusion in its charge to the jury that Key, Conquest, Gary and Romero were equally unavailable to both sides and that the jury should closely scrutinize immunized testimony from the Government's witnesses. (App. at 330–31).

** Those witnesses are James Jackson, Joseph Bethea, LeRoy "Nicky" Barnes, Salvatore Corallo, Walter Centano, Robert "J.R." Thompson, Elvornia Myles, Russell Fleming and Vito Loiacono.

that any information he provided could be used against him if he committed any further crimes or otherwise violated the agreement. By contrast, had a defense witness been granted the immunity sought by the defendants and then later been prosecuted by the Government for an arguably related offense, the Government would have had the "heavy burden" of proving at a *Kastigar* hearing, *see Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), that neither direct *nor* derivative use had been made of that testimony.* *United States v. Turkish*, *supra*, 623 F.2d at 775 (noting obstacles to successful prosecution of immunized witness). Similar cooperation agreements, exposing the respective witnesses to prison terms ranging from 10 to 30 years, governed the testimony of Joseph Bethea, Robert Thompson, Elvornia Myles, Russell Fleming, and Vito Loiacono.

Thus, Reiter's and Clark's suggestion that the Government made "discriminatory use" of the type of immunity that they requested for their potential defense witness is simply unsupportable.

## C. All Proposed Defense Witnesses Were Actual or Potential Targets of Prosecution.

As is set forth above, the law is clear that "trial judges should *summarily* reject claims for defense witness immunity" when the defense witnesses are actual or potential targets of prosecution. *United States v. Turkish*, *supra*, 623 F.2d at 778 (emphasis added). "No hearing should be held to establish such status," and "[t]he prosecutor need only ... set [ ] forth the circumstances that support the prosecutor's suspicion of the witness's criminal activity."

*Id.* This is not a case where the defense called witnesses who were unknown to the Government but who demanded immunity. Instead, all five of the witnesses for whom the defense requested immunity were intricately involved in these criminal proceedings and were actual or potential targets of prosecution themselves. Had their requests for immunity been granted, those witnesses stood to reap a windfall of potential *Kastigar* claims that might have interfered with their future successful prosecutions. For each proposed defense witness, the record is more than sufficient to establish each witness's status as an actual or potential target of prosecution, and Judge Owen was thus entirely justified in summarily rejecting the requests for immunity for each of the proposed witnesses.

### 1. Eugene Romero

The evidence at trial demonstrated that Eugene Romero ran what later became the Jackson enterprise from 1979 through 1982 and participated in the murders of Allen Bailey, Norman Bannister, Beverly Ash, Barry Wilson, Steven Ash and others. Romero had pleaded guilty pursuant to Fed.R.Crim.P. 40 in the District of Columbia to one count of racketeering in the fourth superseding indictment, just *before* Jackson began cooperating. Thus, he plainly faced prosecution, either on the State or the Federal level, on a variety of new charges that Jackson's testimony and other new information had disclosed. Referring to proceedings concerning Romero with which the District Court was already acquainted, the Government informed the Court:

I do represent to the court that it is very possible that Mr. Romero will face subsequent charges in the Southern Dis-

---

* Jackson's cooperation agreement was typical in explicitly allowing the Government to make derivative use of any information Jackson provided and in waiving any claims of "taint" that Jackson might otherwise have had.

trict of New York for conduct that was uncovered subsequent to the date of the entry of his plea.

As your Honor knows, we made a motion to withdraw the plea based upon the newly discovered evidence which Judge Parker in the District of Columbia denied.

However, there are a number of charges that were not contained in the indictment that could be brought against Mr. Romero, and on that basis he does have a valid Fifth Amendment assertion and on that basis the government is not prepared to immunize him.

(Tr. 6238–39). The District Court was plainly justified in concluding that Romero was an "actual or potential target of prosecution," and neither Reiter nor Clark points to anything in the record to suggest that the District Court's conclusion was erroneous. Furthermore, in light of the fact that Reiter called Romero to testify solely about how he obtained a scar on his hand (Tr. 6236), it is by no means clear that such testimony would ever meet the materiality requirement of *United States v. Burns, supra.*

### 2. Ted Key

Ted Key, who was an active member of Jackson's racketeering enterprise and who, according to Jackson, had participated in the murder of James "Boo" Simmons, was called by Reiter to testify that

he had never seen Reiter. (Tr. 7305–06). Key had made a number of statements to prosecutors and other Federal officials that were inconsistent with answers that Slotnick and other defense counsel said they expected to elicit. (Tr. 7303–05). The Government informed the Court that "Ted Key has made contrary statements to the testimony that Mr. Slotnick anticipates in our office. He can be prosecuted for the false statements to us, if he now contends they were false. He is in tremendous jeopardy." (Tr. 7315–16). The Government also stated that Key:

always faces exposure in the state. There is no plea agreement entered into with Mr. Key where he has some kind of immunity. He always faces prosecution by the state for any narcotics activities he may talk about, he faces possible prosecution on the homicide if it were to come out that he was involved in the Simmons homicide.

(Tr. 7341).*

In response to an assertion by Reiter that Key's "invocation of the Fifth is frivolous," the District Court responded: "He pled to being a member of the Jackson organization, selling heroin, and that was the limit and extent of his plea. You can look at the minutes." (Tr. 7334). The District Court thus had ample basis to decline to order the Government to grant immunity to Key on the grounds that Key was a potential target of further prosecution.

---

\* Reiter's suggestion that the Government "intimidated" Key into asserting his Fifth Amendment privilege is contradicted by the statements in the record by Key's own counsel, which confirms that Key had never wanted to testify because his testimony might put him in jeopardy of further prosecution and that Key only entertained the thought of testifying as a result of pressure originating from the defendants. (Tr. 7296–97, 7324–28, 7330, 7435). As the Government pointed out, Key already felt intimidated, not by the Government, but by the defendants. (Tr. 7307, 7310, 7324, 7328–29). If Key had agreed to testify, the Government could easily have established the damaging fact that he had identified a photograph of Clark, whose crimes were known but whose identity was unknown to the Government, prior to Clark's arrest. It is thus ironic that Clark now complains of his exclusion. (Tr. 7321–22).

### 3. Ronald Conquest

Ronald Conquest, also known as Ronald Maxwell, who was the husband of Renee Gary, was one of Reiter's tial target of immunity. In addition, other than stating that Gary would be asked "limited questions that will not create exposure" (Tr. 7263), Reiter proffered nothing about the subject matter of Gary's testimony. Accordingly, not only was Gary an actual or potential target of prosecution, but Reiter plainly did not meet his required burden of showing that her testimony would be material, exculpatory, not cumulative and unobtainable from any other source.

### 5. Olga Endara

Olga Endara, an employee at DTF Marina, was, according to Reiter's proffer, going to testify about Frank DeStefano's falsifying of certain invoices that were introduced into evidence in connection with the tax count against Reiter. (Tr. 7171–74). After Endara invoked her privilege against self-incrimination, the Government represented to the trial court that plea discussions were under way with Endara concerning an investigation of Endara's personal income taxes by the Internal Revenue Service. (Tr. 7070–71). In addition, the Government stated that DTF Marina, where Endara was employed, was under investigation for its corporate tax returns. (Tr. 7171). The Government's assertions were not disputed, and the District Court obviously had a sound basis to conclude that Endara was a target of prosecution.

### D. Conclusion

The record is thus clear that all five defense witnesses for whom immunity was sought were targets of prosecution. That status made it unnecessary for the District Court to hold a hearing to determine whether the evidence each witness might offer was material, exculpatory, not cumulative and not obtainable from any other source. *United States v. Burns, supra,* 684 F.2d at 1077. Even without such a hearing with respect to many of the witnesses, it was highly questionable whether their testimony could meet the *Burns* test. In any event, once the District Court had determined that each witness was asserting his or her claim of privilege concerning areas of inquiry that were the subjects of potential prosecution, it was not an abuse of discretion to decline to order immunity. There was no discriminatory use of immunity by the Government, and "[t]he essential fairness required by the Fifth Amendment ... does not create a general obligation for prosecutors or courts to obtain evidence protected by lawful privileges." *United States v. Turkish, supra,* 623 F.2d at 777. Accordingly, Reiter's and Clark's claim that they were denied Due Process by the failure to have defense witnesses immunized should be denied.

### POINT VI

**The District Court Properly Charged the Jury.**

Reiter claims that the District Court erred both by failing to require special interrogatories identifying the five people supervised by Reiter in his continuing criminal enterprise ("CCE") and by giving improper instructions regarding aiding and abetting, conspiracy and evidence of flight. Reiter's claims are wrong.

### A. The District Court Did Not Abuse Its Discretion In Denying Reiter's Request for Special Interrogatories for The CCE Count.

Reiter first contends that the District Court erred in refusing to submit special interrogatories to the jury requiring it to

identify the five or more individuals supervised by him in connection with the CCE count. Relying on *United States v. Roman*, 870 F.2d 65 (2d Cir.1989), *cert.* were managed, supervised or organized by Reiter in the operation of his continuing criminal enterprise.

#### a. James Jackson *

The evidence that Jackson was organized, supervised, or managed by Reiter, his primary heroin supplier from at least 1982 through 1987, was overwhelming and is fully set forth in the Statement of Facts. Among other evidence, it includes proof that Jackson helped Reiter collect money from recalcitrant customers, such as Eric Von Zipp (Tr. 526–30), and explicitly followed Reiter's orders to kill Beverly and Steven Ash in order to protect Reiter's continuing criminal enterprise. (Tr. 317–43).

#### b. Eugene Romero

Again the overwhelming "supervisee" evidence as to Romero, fully set out above, need not be repeated. Romero, among numerous other activities on Reiter's behalf, directly organized the murders of Beverly and Steven Ash because, once he received Reiter's order to do so, "he was going to do what [he] h[ad] to do." (Tr. 318–19). The sufficiency of the evidence as to his status as a "supervisee" is indisputable.

#### c. Salvatore Corallo

Corallo was one of Reiter's primary lackeys. In addition to storing, processing and distributing heroin at Reiter's direction, Salvatore Corallo obeyed Reiter's command to plead guilty to narcotics charges before the Honorable Mary Johnson Lowe so that Reiter's continuing criminal enterprise would not be jeopardized. (Tr. 2443–51). Corallo was Reiter's "mule," and he explicitly testified at trial that Reiter managed and supervised his heroin activities.

#### d. Vito Loiacono

Loiacono, another lackey for Reiter, distributed heroin to and collected money from Reiter's heroin customers, including Jackson, Peter Monsanto, Eric Von Zipp, Mitchell Jackson, Ronald Conquest, Warren Tyson and others. (Tr. 4049–4144). His status as a supervisee, fully set forth at length in his trial testimony, is simply beyond dispute.

#### e. Billy Battista

Billy Battista, known to Jackson as Billy "White Hair," became Reiter's right-hand man. Early on Battista was "distributing the heroin for Mark, pick[ing] up money, set[ting] up appointments, pack[ing] up the drugs and stor[ing] it." (Tr. 4028). Representative of the strong supervisee proof as to Battista, he was recorded in a telephone conversation with Corallo, where both complained about the difficulties of working for Reiter. (Tr. 2399–2411; GX 615).

#### f. Russell Fleming

Russell Fleming, who picked up heroin from and delivered cash to Reiter when Jackson was in Virginia and after Jackson's arrest in 1987, acted as a go-between for both Jackson and Reiter. It was

---

* In its main summation, the Government told the jury that as it listened to the District Court's instruction, "five names are going to pop immediately into your head, as [the judge] tells you what supervisees mean. The five names that ... will first pop into your head are James Jackson, Eugene Romero, Billy Battista, Vito Loiacono and Sal Corallo." (Tr. 8805).

Fleming who communicated to Jackson both Reiter's initial refusal to provide money for Jackson to pay his lawyer and Reiter's subsequent decision, after Ruggiero's intervention, to provide heroin to Fleming to subsidize Jackson's defense. When Reiter learned that Jackson was cooperating with the Government, Reiter instructed Loiacono to contact Warren Tyson, a/k/a "Otis," to have Fleming killed. (Tr. 4172). From at least 1986 until he was arrested in 1987, Fleming served as Jackson's alter ego and plainly shared Jackson's status as one of Reiter's supervisees.

### g. Warren Tyson, a/k/a "Otis"

Warren Tyson, a/k/a "Otis," was a consignment heroin customer of Reiter from 1985 through 1987, who had been recruited for Reiter by Eugene Romero. (Tr. 4035–39, 4071, 4085–87). Tyson received orders from Reiter via Loiacono to hire a lawyer for Romero after Romero was arrested. (Tr. 4089–91). Tyson also was ordered by Reiter, again through Loiacono, to kill Fleming after Reiter had learned that Jackson was a Government witness (Tr. 4172), and Tyson agreed to contact Loiacono if he learned of Fleming's whereabouts. (Tr. 4173–74). Tyson's consignment obligations to Reiter made Tyson thoroughly dependent on him and allowed Reiter to direct him to perform services for Reiter's continuing criminal enterprise.

### h. Joseph "Jazz" Hayden

Jazz Hayden bought heroin from Reiter on three occasions, with the final two purchases transacted on a consignment basis. (Tr. 4109–14). The distributions ceased because Hayden was arrested. (Tr. 4113–14). Hayden also testified as a witness for Reiter, asserting that he had never purchased heroin from Reiter but instead had tried to borrow money from Reiter. (Tr. 7345–54). The Government properly pointed out on summation that Hayden's perjury on the stand was just one more manifestation of Reiter's control over Hayden.

### i. Ronald Maxwell, a/k/a "Ronald Conquest"

Ronald Conquest, the husband of Renee Gary, received pure heroin from Loiacono at Reiter's direction on at least eight occasions, often on a consignment basis. (Tr. 4072–75). Reiter obtained Conquest as a customer after Mike Levy, the owner of Gianpietro's, had recommended him. (Tr. 4073). When Conquest's wife, Renee Gary, was questioned by the police about Conquest's source of supply, Gary warned Reiter; and, when Conquest was arrested, Reiter helped him retain Robert Simels as his counsel and then had meetings with Simels. The Government argued in summation that Reiter's obtaining of a lawyer for Conquest and being warned by Conquest's wife about dangers from law enforcement, in the context of Conquest's being a consignment customer, was strong evidence of Reiter's supervisory control over Conquest. (Tr. 8864–67). Plainly, Reiter was "calling the shots" with respect to Conquest. *United States v. Bolts*, 558 F.2d 316, 320 (5th Cir.1977), *cert. denied*, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978).

### j. Mike Levy

Mike Levy, the owner of Gianpietro's, performed a variety of services for Reiter, in particular providing a meeting place, message drop and liaison service for Reiter. When Jackson ran "dry" in 1984, he contacted Levy and told him that he needed to see Reiter, and within about 20 minutes, Reiter appeared. Ronald Conquest and Reiter were videotaped coming out of

Gianpietro's, and both Loiacono and Jackson testified about numerous deliveries of heroin that were made at Gianpietro's. Reiter also told Loiacono that he had obtained Ronald Conquest as a heroin customer through Mike Levy (Tr. 4073), and that Levy had introduced him to Peter Monsanto, who received deliveries of heroin at Gianpietro's. (Tr. 4039–40). The evidence amply supported the Government's argument in summation that it was impossible for Mike Levy to have performed those services at Reiter's direction and for all those narcotics activities to have occurred at a small boutique like Gianpietro's, without Mike Levy, the owner, knowing about the criminal nature of Reiter's activities. (Tr. 8867–68).

### k. Cathy Burke

Cathy Burke's name first arose at trial when Corallo described his dealings with the heroin customer whom he described as "Cherry Lime Rickey." (Tr. 2320–23). "Cherry Lime Rickey" was refusing to buy heroin from Reiter because of a previous dispute and therefore Reiter could not use Loiacono as a courier because "Rickey" knew that Loiacono worked for Reiter. (Tr. 2321, 4116–17). Reiter arranged that he, Corallo and Cathy Burke would all meet at a restaurant, and when they all assembled Reiter gave instructions to Burke and Corallo about how Burke was to introduce Corallo to "Rickey." (Tr. 2322). After giving those instructions, "Mark and Cathy spoke in a secret way," following which Burke led Corallo to meet "Rickey" a few blocks away. (Tr. 2322–23). Corallo criticized Reiter for using a woman to assist in heroin deliveries (Tr. 2322), and made the following comments to Burke as she led him to meet "Rickey":

> [A]s we were walking I told her that there was no room in this business for guys and girls, and—it was guys and

girls, and I said it in a way that I was annoyed that she was introducing me to somebody in the heroin business.

(Tr. 2323). Loiacono, who previously had distributed heroin to "Rickey," also testified that his first meeting with "Rickey" had occurred at Cathy Burke's house. (Tr. 4114–17).

In addition to playing an active role in arranging Reiter's heroin distributions to "Rickey," Burke performed other services for Reiter. Intercepted telephone conversations between Reiter and Burke showed that Burke had helped Reiter arrange to have a car put in a nominee's name and that Reiter directed her to contact Allen Morris, a heroin customer whom surveillance agents saw meet with Burke on Labor Day weekend 1987, shortly before Reiter fled to California. (GX 975; Tr. 5363–73, *see also*, Tr. 8849–60). In addition, both Loiacono and surveillance agents confirmed that Burke and Reiter met on the street near Reiter's apartment shortly after Reiter received the warning from Ruggiero that Jackson was cooperating, and that Burke was also present as pay phones were used to warn "Otis" and "Red Jack" about the development. (Tr. 4160–62, 5261–67, 5350–53). Finally, when Loiacono was instructed to give false identification documents to Greg Reiter for him to deliver to his father in Florida, Loiacono was instructed to and did pick them up at Cathy Burke's house. Notwithstanding Reiter's after-the-fact suggestion to the contrary, on the basis of substantial evidence in the record, including telephone conversations played to the jury, there was more than sufficient basis for the jury to conclude that Cathy Burke was one of Reiter's "supervisees."

### l. Greg Reiter

Reiter points out correctly in his brief that the Government confirmed at Reiter's

sentencing that there was no evidence at trial showing that Greg Reiter ever physically delivered heroin. (Reiter Br. at 63). There was, however, ample evidence to demonstrate that Greg Reiter knew about the nature of his father's business and that his father used him repeatedly to assist in that business.

The evidence showed that Greg Reiter was directed by his father, after Reiter had fled, to rid Reiter's apartment of any incriminating evidence. Indeed, Loiacono testified that he discussed with Greg Reiter why Greg Reiter had been so careless as to leave his father's gun. (Tr. 4171, see also Tr. 4169). That conversation occurred when Loiacono delivered to Greg Reiter false identification papers, showing his father's photograph and a different name, for Greg Reiter to deliver to his father in Florida. (Tr. 4168–69, 4171). Equally significant, it is Greg Reiter who delivers a message from his father to Corallo that Corallo was to "[g]ive Vito [Loiacono] anything he wants," plainly referring to the heroin necessary to keep the enterprise going while Reiter was in hiding.* (Tr. 2335–36). Greg Reiter at that time also asked that Salvatore Corallo give Greg a pay telephone number where Greg's father could call Corallo at a specified time—obviously with respect to the enterprise. (Tr. 2335–36). The jury, in short, had ample basis to conclude that Greg Reiter knew that his father was engaged in an illegal enterprise and followed his father's orders in what proved to be a futile attempt to keep that enterprise operating.

### 3. Conclusion

In sum, there was more than sufficient evidence to show that Reiter organized, supervised, or managed at least five people in his narcotics enterprise, including Burke and Greg Reiter. *United States v. Roman, supra*, which was decided after this case and which does not explicitly *require* the use of special interrogatories for a CCE count in any event, does not compel reversal of Reiter's CCE conviction here. Because of the overwhelming "supervisee" proof and because the District Court correctly instructed the jury that it had to be "unanimous as to the 'at least five' persons" chosen, Reiter's CCE conviction must be affirmed.*

---

* The jury heard testimony from Joseph Corallo, Salvatore Corallo's son, to the effect that Joseph Corallo and Greg Reiter were close friends, "like family," and that Salvatore Corallo dealt in heroin.

* Similarly without merit is Reiter's contention that the District Court erred in denying his request to charge explicitly that the requisite five or more underlings had to have been supervised by him in the conduct of the same continuing criminal enterprise. In declining to give that instruction, Judge Owen properly explained that the proposed requirement that the jury find the supervisees were all involved in the same continuing enterprise was "implicit in the charge given." (App. at 348).

Again, to convict a defendant of engaging in a CCE, the Government must prove (1) that he committed a felony under Title 21, (2) that is part of a continuing series of Title 21 violations, (3) which are undertaken by him *in concert with* five or more persons, (4) with respect to whom defendant occupies a position of organizer, supervisor, or manager, and (5) from which defendant obtains substantial income or resources. *United States v. Aiello, supra*, 864 F.2d at 264 (emphasis added); *see United States v. Young, supra*, 745 F.2d at 746–47; 21 U.S.C. § 848(c). While the Government and the District Court agree with the general proposition that Section 848 requires the five or more persons to have acted under a CCE defendant's supervision in the conduct of the same continuing enterprise, *cf. United States v. Rhodes*, 779 F.2d 1019, 1026 (4th Cir.1985), that is just another way of stating the "in concert" requirement already con-

**B. The District Judge Did Not Err In His Jury Charges About Conspiracy And Aiding And Abetting, And In His Charge About Flight.**

In an additional effort to find fault with the District Court's charge to the jury, Reiter claims first that the

tained within the statute itself and in the District Court's charge. Because the District Court's charge to the jury included a proper instruction on the "in concert" requirement (App. at 309) ("you [must] find beyond a reasonable doubt that the defendant Reiter undertook to commit a series of violations of the federal narcotics laws in concert with at least five or more persons") ("[t]his element is satisfied if you find the defendant worked together with a total of at least five others to commit a series of drug violations"), Reiter's claim of error regarding the District Court's charge should be swiftly rejected.